## CLARKE, COMPTROLLER OF THE CURRENCY *v.* SECURITIES INDUSTRY ASSOCIATION

No. 85–971.   Argued November 3, 1986—Decided January 14, 1987*

*Together with No. 85–972, *Security Pacific National Bank* v. *Securities Industry Association,* also on certiorari to the same court.

WHITE, J., delivered the opinion of the Court, in which BRENNAN, MAR-SHALL, BLACKMUN, and POWELL, JJ., joined, and in Parts I and III of which REHNQUIST, C. J., and STEVENS and O'CONNOR, JJ., joined. STEVENS, J., filed an opinion concurring in part and concurring in the judgment, in which REHNQUIST, C. J., and O'CONNOR, J., joined, *post*, p. 409. SCALIA, J., took no part in the consideration or decision of the cases.

*Charles A. Rothfeld* argued the cause for petitioner in No. 85–971. With him on the briefs were *Solicitor General Fried, Assistant Attorney General Willard, Deputy Solicitor General Wallace, Anthony J. Steinmeyer, Nicholas S. Zeppos, Richard V. Fitzgerald,* and *Mark L. Leemon. William T. Coleman, Jr.,* argued the cause for petitioner in No. 85–972. With him on the briefs were *John H. Beisner* and *Edward J. McAniff.*

*James B. Weidner* argued the cause for respondent in both cases. With him on the brief were *David A. Schulz, William J. Fitzpatrick,* and *Donald J. Crawford.*†

JUSTICE WHITE delivered the opinion of the Court.

In these cases, we review an application of the so-called "zone of interest" standing test that was first articulated in *Association of Data Processing Service Organizations, Inc.* v. *Camp,* 397 U. S. 150 (1970). Concluding that respondent is a proper litigant, we also review, and reverse, a judgment that the Comptroller of the Currency exceeded his authority in approving the applications of two national banks for the establishment or purchase of discount brokerage subsidiaries.

I

In 1982, two national banks, Union Planters National Bank of Memphis (Union Planters) and petitioner Security Pacific National Bank of Los Angeles (Security Pacific), applied to the Comptroller of the Currency for permission to open offices that would offer discount brokerage services to the pub-

---

†Briefs of *amici curiae* urging reversal were filed for the American Bankers Association by *John J. Gill III* and *Michael F. Crotty;* for the Consumer Bankers Association by *Craig Ulrich;* and for the New York Clearing House Association by *Robert S. Rifkind.*

Briefs of *amici curiae* urging affirmance were filed for Branch Banking and Trust Co. et al. by *John R. Jordan, Jr., Henry W. Jones, Jr.,* and *Eugene Gressman;* and for Independent Bankers Association of America by *Erwin N. Griswold, Leonard J. Rubin,* and *Mollie A. Murphy.*

lic.[1]   Union Planters proposed to acquire an existing discount brokerage operation, and Security Pacific sought to establish an affiliate named Discount Brokerage.   Both banks proposed to offer discount brokerage services not only at their branch offices but also at other locations inside and outside of their home States.

In passing on Security Pacific's application, the Comptroller was faced with the question whether the operation of Discount Brokerage would violate the National Bank Act's branching provisions.   Those limitations, enacted as §§ 7 and 8 of the McFadden Act, 44 Stat. 1228, as amended, are codified at 12 U. S. C. § 36 and 12 U. S. C. § 81.   Section 81 limits "the general business" of a national bank to its headquarters and any "branches" permitted by § 36.   Section 36(c) provides that a national bank is permitted to branch only in its home State and only to the extent that a bank of the same State is permitted to branch under state law.   The term "branch" is defined at 12 U. S. C. § 36(f) "to include any branch bank, branch office, branch agency, additional office, or any branch place of business . . . at which deposits are received, or checks paid, or money lent."

The Comptroller concluded that "the non-chartered offices at which Discount Brokerage will offer its services will not constitute branches under the McFadden Act because none of the statutory branching functions will be performed there." App. D to Pet. for Cert. in No. 85–971, p. 39a.   He explained that although Discount Brokerage would serve as an intermediary for margin lending, loan approval would take place at chartered Security Pacific offices, so that Discount Brokerage offices would not be lending money within the meaning of § 36(f).   Likewise, although Discount Broker-

---

[1] Discount brokers execute trades on behalf of their customers but do not offer investment advice.   As a result, the commissions they charge are substantially lower than those charged by full-service brokers.   See *Securities Industries Assn.* v. *Board of Governors, FRS,* 468 U. S. 207, 209, n. 2 (1984).

age would maintain, and pay interest on, customer balances created as an incident of its brokerage business, the Comptroller concluded that these accounts differ sufficiently in nature from ordinary bank accounts that Discount Brokerage would not be engaged in receiving deposits.[2]  He further observed that treating offices conducting brokerage activities as branches under § 36(f) would be inconsistent with the "long-standing and widespread" practice of banks' operating nonbranch offices dealing in United States Government or municipal securities.  *Id.*, at 44a.  Accordingly, the Comptroller approved Security Pacific's application.[3]

Respondent, a trade association representing securities brokers, underwriters, and investment bankers, brought this action in the United States District Court for the District of Columbia.  Among other things, respondent contended that bank discount brokerage offices are branches within the meaning of § 36(f) and thus are subject to the geographical

---

[2] The Comptroller relied primarily on the fact that banks publicly solicit deposits and use deposited funds in lending, while credit balances maintained by brokers are not, as such, directly solicited from the public, and are subject to regulatory restrictions regarding use by brokers.  See the Securities Investor Protection Act, 15 U. S. C. § 78aaa *et seq.* (restricting advertising, promotional, and selling practices of brokers regarding interest-bearing free credit balances); 17 CFR § 240.15c3–2 (1986) (regulating the use of credit balances by brokers).

Although the Comptroller believed that § 36(f) should be read narrowly to define "branch" only with reference to receiving deposits, making loans, and cashing checks, he recognized that there is authority supporting a broader reading.  In *St. Louis County National Bank* v. *Mercantile Trust Company National Assn.*, 548 F. 2d 716 (CA8 1976), cert. denied, 433 U. S. 909 (1977), a trust office operated by a national bank was held to be a branch.  While disagreeing with this holding, the Comptroller took the position that it "should at the very least be limited to those dealings with the public requiring a specialized banking or similar license."  App. D to Pet. for Cert. in No. 85–971, pp. 43a–44a.

[3] A month later, the Comptroller approved without comment the application of Union Planters to acquire an existing brokerage firm.  App. E to Pet. for Cert. in No. 85–971, p. 47a.

restrictions imposed by § 36(c).[4]   The Comptroller disputed this position on the merits and also argued that respondent lacks standing because it is not within the zone of interests protected by the McFadden Act.[5]   The Comptroller contended that Congress passed the McFadden Act not to protect securities dealers but to establish competitive equality between state and national banks.

The District Court, relying on *Association of Data Processing Service Organizations, Inc.* v. *Camp,* 397 U. S. 150 (1970), held that respondent has standing and rejected the Comptroller's submission that national banks may offer discount brokerage services at nonbranch locations.   A divided panel of the Court of Appeals affirmed in a brief *per curiam* opinion,[6] 244 U. S. App. D. C. 419, 758 F. 2d 739 (1985), and rehearing en banc was denied, with three judges dissenting. 247 U. S. App. D. C. 42, 765 F. 2d 1196 (1985).

---

[4] Respondent also contended that national banks are entirely prohibited from offering discount brokerage services by the Glass-Steagall Act, 12 U. S. C. § 24 (1982 ed. and Supp. III); 12 U. S. C. §§ 78, 377, 378.   This contention was rejected by the District Court, a holding that is not before us.

[5] The Comptroller also argued unsuccessfully that respondent could show no injury, and thus had not presented the court with a "case or controversy" within the meaning of Article III.   The Comptroller has since abandoned this argument.

[6] The dissenting judge argued that there was no standing, as he did in dissenting, with two other judges, from the denial of en banc rehearing. In his view, the purpose of the McFadden Act is to establish competitive equality between national and state banks as regards branching, and while "state banks (and state banking commissions) are obviously within the zone of interests protected by the statute, . . . the brokerage houses suing in the present case are no more within it than are businesses competing for the parking spaces that an unlawful branch may occupy." 247 U. S. App. D. C., at 43, 765 F. 2d, at 1197.   The dissenter also argued that the indefinite language of § 36(f) "presents precisely the situation in which our deference to the agency should be at its height" *id.*, at 44, 765 F. 2d, at 1198, and concluded that the Comptroller's construction of the statute "cannot by any means be considered unreasonable" and therefore should be affirmed if respondent is held to have standing.   *Ibid.*

The Comptroller sought review by petition for certiorari, as did Security Pacific. We granted both petitions, and consolidated the cases. 475 U. S. 1044 (1986). We now affirm the judgment that respondent has standing, but reverse on the merits.

## II

In *Association of Data Processing Service Organizations, Inc.* v. *Camp, supra,* the association challenged a ruling by the Comptroller allowing national banks, as part of their incidental powers under 12 U. S. C. § 24 Seventh, to make data-processing services available to other banks and to bank customers. There was no serious question that the data processors had sustained an injury in fact by virtue of the Comptroller's action. Rather, the question, which the Court described as one of standing, was whether the data processors should be heard to complain of that injury. The matter was basically one of interpreting congressional intent,[7] and the Court looked to § 10 of the Administrative Procedure Act (APA), 5 U. S. C. § 702, which "grants standing to a person 'aggrieved by agency action within the meaning of a relevant statute.'" 397 U. S., at 153. The Court of Appeals had interpreted § 702 as requiring either the showing of a "legal interest," as that term had been narrowly construed in our earlier cases, *e. g., Tennessee Electric Power Co.* v. *TVA,* 306 U. S. 118, 137 (1939), or alternatively as requiring an explicit provision in the relevant statute permitting suit by any party "adversely affected or aggrieved."[8] See *Association of Data Processing Service Organizations, Inc.* v. *Camp,* 406

---

[7] "Congress can, of course, resolve the question [of standing] one way or another, save as the requirements of Article III dictate otherwise." 397 U. S., at 154.

[8] Section 402(b) of the Communications Act of 1934, as amended, 47 U. S. C. § 402(b), is an example of a statute granting an explicit right of review to all persons adversely affected or aggrieved by particular agency actions (there, licensing actions by the Federal Communications Commission). See generally *FCC* v. *Sanders Bros. Radio Station,* 309 U. S. 470 (1940).

F. 2d 837 (CA8 1969). This Court was unwilling to take so narrow a view of the APA's "'generous review provisions,'" 397 U. S., at 156 (quoting *Shaughnessy* v. *Pedreiro,* 349 U. S. 48, 51 (1955)), and stated that in accordance with previous decisions the Act should be construed "not grudgingly but as serving a broadly remedial purpose," *ibid.* (citing *Shaughnessy, supra,* and *Rusk* v. *Cort,* 369 U. S. 367, 379–380 (1962)). Accordingly, the data processors could be "within that class of 'aggrieved' persons who, under § 702, are entitled to judicial review of 'agency action,'" 397 U. S., at 157, even though the National Bank Act itself has no reference to aggrieved persons, and, for that matter, no review provision whatsoever.[9] It was thought, however, that Congress, in enacting § 702, had not intended to allow suit by every person suffering injury in fact. What was needed was a gloss on the meaning of § 702. The Court supplied this gloss by adding to the requirement that the complainant be "adversely affected or aggrieved," *i. e.,* injured in fact, the

---

[9] We have most recently reaffirmed this liberal reading of the review provisions of the APA in *Japan Whaling Assn.* v. *American Cetacean Society,* 478 U. S. 221 (1986). There, the Cetacean Society sought judicial review of the Secretary of Commerce's refusal to carry out his alleged duty, under the Pelly Amendment to the Fishermen's Protective Act of 1967, to certify Japan for taking actions that diminished the effectiveness of the International Convention for the Regulation of Whaling. The Secretary contended, among other things, that the Cetacean Society had no private cause of action under the Pelly Amendment. We rejected this argument, holding that respondents had a right of action "expressly created by the Administrative Procedure Act (APA), which states that 'final agency action for which there is no other adequate remedy in a court [is] subject to judicial review,' § 704, at the behest of '[a] person . . . adversely affected or aggrieved by agency action.'" *Id.,* at 231, n. 4. We held further, with citations to such previous decisions as *Block* v. *Community Nutrition Institute,* 467 U. S. 340 (1984), that "[a] separate indication of congressional intent to make agency action reviewable under the APA is not necessary; instead, the rule is that the cause of action for review of such action is available absent some clear and convincing evidence of legislative intention to preclude review." *Japan Whaling, supra,* at 231, n. 4.

additional requirement that "the interest sought to be protected by the complainant [be] arguably within the zone of interests to be protected or regulated by the statute or constitutional guarantee in question." *Id.*, at 153.

The Court concluded that the data processors were arguably within the zone of interests established by § 4 of the Bank Service Corporation Act of 1962, 76 Stat. 1132, 12 U. S. C. § 1864, which forbids bank service corporations to "engage in any activity other than the performance of bank services for banks." See 397 U. S., at 155. In so holding, the Court relied on a brief excerpt from the legislative history of § 4 indicating that Congress intended to enforce adherence to "the accepted public policy which strictly limits banks to banking." *Ibid.* (internal quotations omitted).[10] The data processors were therefore permitted to litigate the validity of the Comptroller's ruling.

The "zone of interest" formula in *Data Processing* has not proved self-explanatory,[11] but significant guidance can nonetheless be drawn from that opinion. *First*. The Court interpreted the phrase "a relevant statute" in § 702 broadly; the data processors were alleging violations of 12 U. S. C. § 24 Seventh, see 397 U. S., at 157, n. 2, yet the Court relied on the legislative history of a much later statute, § 4 of the Bank

---

[10] Subsequently, in *Arnold Tours, Inc.* v. *Camp*, 400 U. S. 45 (1970), the Court held that, under the rationale of *Data Processing*, travel agents have standing to challenge the Comptroller's decision to allow banks, pursuant to their incidental powers under 12 U. S. C. § 24 Seventh, to provide travel services to their customers. The Court found it of no moment that Congress never specifically focused on the interests of travel agents in enacting § 4 of the Bank Service Corporation Act. 400 U. S., at 46, and n. 3.

[11] The zone test has also been the subject of considerable scholarly writing, much of it critical. See, *e. g.*, 4 K. Davis, Administrative Law Treatise § 24:17 (2d ed. 1983); Stewart, The Reformation of American Administrative Law, 88 Harv. L. Rev. 1667, 1731–1734 (1975); Albert, Standing to Challenge Administrative Action: An Inadequate Surrogate for Claim for Relief, 83 Yale. L. J. 425 (1974); Scott, Standing in the Supreme Court—A Functional Analysis, 86 Harv. L. Rev. 645 (1973); Jaffe, Standing Again, 84 Harv. L. Rev. 633, 634, and n. 9 (1971).

Service Corporation Act of 1962, in holding that the data processors satisfied the "zone of interest" test. *Second.* The Court approved the "trend . . . toward [the] enlargement of the class of people who may protest administrative action." 397 U. S., at 154. At the same time, the Court implicitly recognized the potential for disruption inherent in allowing every party adversely affected by agency action to seek judicial review. The Court struck the balance in a manner favoring review, but excluding those would-be plaintiffs not even "arguably within the zone of interests to be protected or regulated by the statute . . . ." *Id.*, at 153.[12]

The reach of the "zone of interest" test, insofar as the class of potential plaintiffs is concerned, is demonstrated by the subsequent decision in *Investment Company Institute* v. *Camp*, 401 U. S. 617 (1971). There, an association of open-end investment companies and several individual investment companies sought, among other things, review of a Comptroller's regulation that authorized banks to operate collective investment funds. The companies alleged that the regulation violated the Glass-Steagall Banking Act of 1933, which prohibits banks from underwriting or issuing securities. See 12 U. S. C. § 24 Seventh. The Comptroller urged that the plaintiffs lacked standing, to which the Court responded that plaintiffs not only suffered actual injury but, as in *Data Processing*, suffered injury from the competition that Congress had arguably legislated against by limiting the activities available to national banks.[13]

---

[12] The Court's concern was to ensure that the data processors' association would be "a reliable private attorney general to litigate the issues of the public interest in the present case." 397 U. S., at 154. The language quoted is directed most immediately to the inquiry whether sufficient concrete adversity existed in the case to satisfy Article III. However, the concern that the plaintiff be "reliable" carries over to the "zone of interest" inquiry, which seeks to exclude those plaintiffs whose suits are more likely to frustrate than to further statutory objectives.

[13] The Court stated:

"This contention [that plaintiffs lack standing] is foreclosed by *Data Processing Service* v. *Camp*, 397 U. S. 150. There we held that companies

Justice Harlan, in dissent, complained that there was no evidence that Congress had intended to benefit the plaintiff's class when it limited the activities permitted national banks. The Court did not take issue with this observation; it was enough to provide standing that Congress, for its own reasons, primarily its concern for the soundness of the banking system, had forbidden banks to compete with plaintiffs by entering the investment company business.

---

that offered data processing services to the general business community had standing to seek judicial review of a ruling by the Comptroller that national banks could make data processing services available to other banks and to bank customers. We held that data processing companies were sufficiently injured by the competition that the Comptroller had authorized to create a case or controversy. The injury to the petitioners in the instant case is indistinguishable. We also concluded that Congress did not intend 'to preclude judicial review of administrative rulings by the Comptroller as to the legitimate scope of activities available to national banks under [the National Bank Act].' 397 U. S., at 157. This is precisely the review that the petitioners have sought in this case. Finally, we concluded that Congress had arguably legislated against the competition that the petitioners sought to challenge, and from which flowed their injury. We noted that whether Congress had indeed prohibited such competition was a question for the merits. In the discussion that follows in the balance of this opinion we deal with the merits of petitioners' contentions and conclude that Congress did legislate against the competition that the petitioners challenge. There can be no real question, therefore, of the petitioners' standing in the light of the *Data Processing* case. See also *Arnold Tours* v. *Camp*, 400 U. S. 45." 401 U. S., at 620–621.

In the discussion of the merits that followed, the Court interpreted the Glass-Steagall Act as reflecting "a [congressional] determination that policies of competition, convenience, or expertise which might otherwise support the entry of commercial banks into the investment banking business were outweighed by the 'hazards' and 'financial dangers' that arise when commercial banks engage in the activities proscribed by the Act." *Id.*, at 630 (footnote omitted). The Court described these "hazards" primarily in terms of the danger to banks of making imprudent investments or risky loans, as well as the dangers of possible loss of public confidence in banks and the danger to the economy as a whole of speculation fueled by bank loans for investment purposes. *Id.*, at 629–634.

Our decision in *Block* v. *Community Nutrition Institute*, 467 U. S. 340 (1984), provides a useful reference point for understanding the "zone of interest" test. There, we held that while milk handlers have the right to seek judicial review of pricing orders issued by the Secretary of Agriculture under the Agricultural Marketing Agreement Act of 1937, consumers have no such right, because "[a]llowing consumers to sue the Secretary would severely disrupt [the] complex and delicate administrative scheme." *Id.*, at 348. We recognized the presumption in favor of judicial review of agency action, but held that this presumption is "overcome whenever the congressional intent to preclude judicial review is 'fairly discernible in the statutory scheme.'" *Id.*, at 351 (quoting *Data Processing*, 397 U. S., at 157). The essential inquiry is whether Congress "intended for [a particular] class [of plaintiffs] to be relied upon to challenge agency disregard of the law." 467 U. S., at 347 (citing *Barlow* v. *Collins*, 397 U. S. 159, 167 (1970)).

The "zone of interest" test is a guide for deciding whether, in view of Congress' evident intent to make agency action presumptively reviewable, a particular plaintiff should be heard to complain of a particular agency decision. In cases where the plaintiff is not itself the subject of the contested regulatory action, the test denies a right of review if the plaintiff's interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress intended to permit the suit. The test is not meant to be especially demanding;[14] in particular, there need be no indication of congressional pur-

---

[14] Thus, in *Data Processing*, the Court found it sufficient to establish reviewability that the general policy implicit in the National Bank Act and the Bank Service Corporation Act was "apparent" and that "those whose interests are directly affected by a broad or narrow interpretation of the Acts are easily identifiable." 397 U. S., at 157.

pose to benefit the would-be plaintiff. *Investment Company Institute* v. *Camp*, 401 U. S. 617 (1971).[15]

The inquiry into reviewability does not end with the "zone of interest" test. In *Community Nutrition Institute*, the interests of consumers were arguably within the zone of interests meant to be protected by the Act, see 467 U. S., at 347, but the Court found that point not dispositive, because at bottom the reviewability question turns on congressional intent, and all indicators helpful in discerning that intent must be weighed.[16]

----

[15] Insofar as lower court decisions suggest otherwise, see, *e. g.*, *Control Data Corp.* v. *Baldrige*, 210 U. S. App. D. C. 170, 180–181, 655 F. 2d 283, 293–294, cert. denied, 454 U. S. 881 (1981), they are inconsistent with our understanding of the "zone of interest" test, as now formulated.

[16] The principal cases in which the "zone of interest" test has been applied are those involving claims under the APA, and the test is most usefully understood as a gloss on the meaning of § 702. While inquiries into reviewability or prudential standing in other contexts may bear some resemblance to a "zone of interest" inquiry under the APA, it is not a test of universal application. *Data Processing* speaks of claims "arguably within the zone of interests to be protected or regulated by the statute *or constitutional guarantee* in question." 397 U. S., at 153 (emphasis added). We doubt, however, that it is possible to formulate a single inquiry that governs all statutory and constitutional claims. As the Court commented in *Data Processing:* "Generalizations about standing to sue are largely worthless as such." *Id.*, at 151. We have occasionally listed the "zone of interest" inquiry among general prudential considerations bearing on standing, see, *e. g.*, *Valley Forge Christian College* v. *Americans United for Separation of Church & State, Inc.*, 454 U. S. 464, 475 (1982), and have on one occasion conducted a "zone of interest" inquiry in a case brought under the Commerce Clause, see *Boston Stock Exchange* v. *State Tax Comm'n*, 429 U. S. 318, 320–321, n. 3 (1977). While the decision that there was standing in *Boston Stock Exchange* was undoubtedly correct, the invocation of the "zone of interest" test there should not be taken to mean that the standing inquiry under whatever constitutional or statutory provision a plaintiff asserts is the same as it would be if the "generous review provisions" of the APA apply, *Data Processing*, 397 U. S., at 156.

The difference made by the APA can be readily seen by comparing the "zone of interest" decisions discussed *supra*, at 394–398, with cases in which a private right of action under a statute is asserted in conditions that make the APA inapplicable. See, *e. g.*, *Cort* v. *Ash*, 422 U. S. 66 (1975);

   In considering whether the "zone of interest" test provides or denies standing in these cases, we first observe that the Comptroller's argument focuses too narrowly on 12 U. S. C. § 36, and does not adequately place § 36 in the overall context of the National Bank Act.  As *Data Processing* demonstrates, we are not limited to considering the statute under which respondents sued, but may consider any provision that helps us to understand Congress' overall purposes in the National Bank Act.  See *supra,* at 396.

   Section 36 is a limited exception to the otherwise applicable requirement of § 81 that "the general business of each national banking association shall be transacted in the place specified in its organization certificate . . . ."  Prior to the enactment of § 36, § 81 had been construed to prevent branching by national banks.  *Lowry National Bank,* 29 Op. Atty. Gen. 81 (1911), approved in *First National Bank in St. Louis* v. *Missouri,* 263 U. S. 640, 656–659 (1924).  We have described the circumstances surrounding the enactment of § 36 as part of the McFadden Act, and its subsequent modification by the amendments added through the Bank Act of 1933, in *First National Bank of Logan* v. *Walker Bank & Trust Co.,* 385 U. S. 252 (1966), and we will not repeat that history in

---

*Cannon* v. *University of Chicago,* 441 U. S. 677 (1979).  In *Cort,* corporate shareholders sought recovery of funds that a corporate official had expended in alleged violation of 18 U. S. C. § 610, the then-current version of the Corrupt Practices Act, which prohibits corporate expenditures and contributions for the purpose of influencing federal candidate elections. The Court gave the would-be plaintiffs the threshold burden of showing that they were "one of the class for whose *especial* benefit the statute was enacted," 422 U. S., at 78 (internal quotation omitted; emphasis in original).  The shareholders argued that § 610 was motivated in part by Congress' conviction that corporate officials have no moral right to use corporate assets for political purposes.  The Court, in holding that this was not enough to give the shareholders an implied right of action under § 610, observed that "the protection of ordinary stockholders was at best a secondary concern [underlying § 610]."  *Id.,* at 81.  Clearly, the Court was requiring more from the would-be plaintiffs in *Cort* than a showing that their interests were arguably within the zone protected or regulated by § 610.

detail here. It is significant for our present inquiry that Congress rejected attempts to allow national banks to branch without regard to state law. See *id.*, at 259. There were many expressions of concern about the effects of branching among those who supported the McFadden Act, as well as among its opponents. Allusion was made to the danger that national banks might obtain monopoly control over credit and money if permitted to branch. 66 Cong. Rec. 4438 (1925) (remarks of Sen. Reed). The sponsor of the Act himself stated that "[t]his bill is much more an antibranch-banking bill than a branch-banking bill." *Id.*, at 1582 (remarks of Rep. McFadden).[17] In short, Congress was concerned not only with equalizing the status of state and federal banks, but also with preventing the perceived dangers of unlimited branching.

---

[17] Representative McFadden explained:

"[The Act] prohibits national banks from engaging in state-wide branch banking in any State (secs. 7 and 8); it prohibits a national bank from engaging in county-wide branching in any state (secs. 7 and 8); it prohibits national and State member banks [of the Federal Reserve System] from establishing any branches in cities of less than 25,000 population (secs. 8 and 9); it prohibits national banks from having any branches in any city located in a State which prohibits branch banking (sec. 8); it prohibits a national bank after consolidating with a State bank to continue in operation any branches which the State bank may have established outside of city limits (sec. 1); it prohibits a State bank upon converting into a national bank to retain in operation any branches which may have been established outside of city limits (sec. 7)." 66 Cong. Rec. 1582 (1925).

See also, *e. g.*, *id.*, at 1569 (remarks of Rep. Nelson); *id.*, at 1624–1625 (remarks of Rep. Goldsborough); *id.*, at 1633 (remarks of Rep. Williams); *id.*, at 1637 (remarks of Rep. Hull).

Congress subsequently relaxed some of the restrictions on branching to which Representative McFadden alluded in the passage quoted above. For example, statewide branching by national banks is now permitted if state law explicitly permits statewide branching by state banks. 12 U. S. C. § 36(c)(2). However, such modifications obviously do not represent an abandonment by Congress of the policy against unlimited branching.

The interest respondent asserts has a plausible relationship to the policies underlying §§ 36 and 81 of the National Bank Act. Congress has shown a concern to keep national banks from gaining a monopoly control over credit and money through unlimited branching. Respondent's members compete with banks in providing discount brokerage services — activities which give banks access to more money, in the form of credit balances, and enhanced opportunities to lend money, viz., for margin purchases. "Congress [has] arguably legislated against the competition that [respondent seeks] to challenge," *Investment Company Institute*, 401 U. S., at 620, by limiting the extent to which banks can engage in the discount brokerage business and hence limiting the competitive impact on nonbank discount brokerage houses.

These cases can be analogized to *Data Processing* and *Investment Company Institute*. In those cases the question was what activities banks could engage in at all; here, the question is what activities banks can engage in without regard to the limitations imposed by state branching law. In both cases, competitors who allege an injury that implicates the policies of the National Bank Act are very reasonable candidates to seek review of the Comptroller's rulings. There is sound reason to infer that Congress "intended [petitioner's] class [of plaintiffs] to be relied upon to challenge agency disregard of the law." *Community Nutrition Institute*, 467 U. S., at 347. And we see no indications of the kind presented in *Community Nutrition Institute* that make "fairly discernible" a congressional intent to preclude review at respondent's behest. We conclude, therefore, that respondent was a proper party to bring this lawsuit, and we now turn to the merits.

III

"It is settled that courts should give great weight to any reasonable construction of a regulatory statute adopted by the agency charged with the enforcement of that statute. The Comptroller of the Currency is charged with

the enforcement of banking laws to an extent that warrants the invocation of this principle with respect to his deliberative conclusions as to the meaning of these laws. See *First National Bank* v. *Missouri*, 263 U. S. 640, 658." *Investment Company Institute* v. *Camp, supra,* at 626–627.

See also, *e. g., United States* v. *Riverside Bayview Homes, Inc.,* 474 U. S. 121 (1985); *Chemical Manufacturers Assn.* v. *Natural Resources Defense Council, Inc.,* 470 U. S. 116 (1985); *Chevron U. S. A. Inc.* v. *Natural Resources Defense Council, Inc.,* 467 U. S. 837 (1984).

Respondent contends that the Comptroller's interpretation of the Bank Act is not entitled to deference because it contradicts the plain language of the statute. Respondent relies on 12 U. S. C. § 81, which provides:

"The general business of each national banking association shall be transacted in the place specified in its organization certificate and in the branch or branches, if any, established or maintained by it in accordance with the provisions of section 36 of this title."

In respondent's view, the unambiguous meaning of § 81 is that "national banks may locate their business only at their headquarters or licensed branches within the same state." Brief for Respondent 11. However, § 81 is considerably more ambiguous than respondent allows. The phrase "[t]he general business of each national banking association" in § 81 need not be read to encompass all the business in which the bank engages, but, as we shall explain, can plausibly be read to cover only those activities that are part of the bank's core banking functions.

Prior to 1927, the predecessor of § 81 (Rev. Stat. § 5190) provided that "the usual business of each national banking association shall be transacted at an office or banking-house located in the place specified in its organization certificate." In *Lowry National Bank*, 29 Op. Atty. Gen. 81 (1911), the

Attorney General interpreted this statute to permit "a bank [to] maintain an [extra-office] agency, the power of which is restricted to dealing in bills of exchange, or possibly to some other particular class of business incident to the banking business," but to forbid "a bank to establish a branch for the transaction of a general banking business." *Id.*, at 86. The Attorney General went on to cite cases which he viewed as "recogniz[ing] a vital distinction between a mere agency for the transaction of a particular business and a branch bank wherein is carried on a general banking business." *Id.*, at 87. He summarized the distinction as follows:

> "An agency requires no division of the capital stock, and the details of the business are few and are easily supervised by the officers of the bank, while a branch bank requires, in effect, a division of the capital, the working force is organized, and the business conducted as if it were a separate organization, and it competes in all branches of the banking business with other banks in that locality the same as if it were an independent institution." *Id.*, at 87–88.

The Court subsequently approved this interpretation of § 5190 in *First National Bank in St. Louis* v. *Missouri*, 263 U. S., at 658.

The *Lowry National Bank* opinion, which is part of the background against which Congress legislated when it passed the McFadden Act in 1927, does not interpret § 5190 as requiring national banks to conduct *all* of their business at the central office. The opinion equates "the usual business of banking" with "a general banking business," and envisions branching in terms of the performance of core banking functions.

Respondent attempts to sidestep the *Lowry* opinion by arguing that Congress changed the meaning of § 5190 when, in passing the McFadden Act, it changed the words "the usual business of each national banking association" to "the general business of each national banking association." Respondent

has pointed to nothing in the legislative history of the McFadden Act, however, indicating that this change in the wording had substantive significance. We find reasonable the Comptroller's position that "the amendment simply codified the accepted notion that the 'usual business' of a bank was the 'general banking business.'" Reply Brief for Federal Petitioner 5, n. 5.

Respondent's fallback position from its "plain language" argument is that the phrase "general business" in § 81 at least refers to all activities in which Congress has specifically authorized a national bank to engage, including the trading in securities that the McFadden Act authorized by the amendment of 12 U. S. C. § 24 Seventh. See McFadden Act, ch. 191, § 2, 44 Stat. 1226. However, petitioner Security Pacific has provided a counter-example to this general thesis: In § 2(b) of the McFadden Act, Congress specifically authorized national banks' involvement in the safe-deposit business, and in doing so deleted language from the bill that arguably would have limited the bank's authority "to conduct a safe deposit business" to activities "located on or adjacent to the premises of such association." 67 Cong. Rec. 3231 (1926). In floor debates, Representative McFadden, in response to the question from Representative Celler whether the bill as amended would permit "a safe-deposit business [to be] conducted a block away or a mile away from a national banking association," replied that the deletion of the language regarding location "removes the limitations which might be very embarrassing to an institution." *Id.*, at 3232.[18] In view of this exchange, we are not persuaded that Congress intended the locational restriction of § 81 and § 36 to reach all activities in which national banks are specifically authorized to engage.

---

[18] Representative Wingo then remarked that the locational language that was deleted was to make clear that the limitations on the total amount a bank can invest in the safe-deposit business applies irrespective of whether the business is conducted on or off the bank's premises. 67 Cong. Rec. 3232 (1926).

Respondent also relies on the following statement, which Representative McFadden placed in the Congressional Record 10 days after the passage of the McFadden Act, while Congress was in recess:

> "[Section 36(f)] defines the term 'branch.' Any place outside of or away from the main office where the bank carries on its business of receiving deposits, paying checks, lending money, or transacting any business carried on at the main office, is a branch if it is legally established under the provisions of this act." 68 Cong. Rec. 5816 (1927).

We do not attach substantial weight to this statement, which Congress did not have before it in passing the McFadden Act. As the Comptroller persuasively argues, Representative McFadden cannot be considered an impartial interpreter of the bill that bears his name, since he was not favorably disposed toward branch banking.[19] If we took literally Representative McFadden's view of § 36(f), we would have to conclude that Congress intended to overturn the Attorney General's opinion in *Lowry National Bank*, 29 Op. Atty. Gen. 81 (1911), which this Court had previously approved in *First National Bank in St. Louis* v. *Missouri, supra,* at 658. Congress never specifically indicated such an intention, and we find it hard to imagine that it would have made such a change without comment.

It is significant that in passing the McFadden Act, Congress recognized and for the first time specifically authorized the practice of national banks' engaging in the buying and selling of investment securities. See Act of Feb. 25, 1927, ch. 191, § 2, 44 Stat. 1226.[20] Prior to 1927, banks had con-

---

[19] See Brief for Federal Petitioner 33–34, n. 23. See also n. 16, *supra,* and accompanying text.

[20] The legislation authorized national banks to engage in "the business of buying and selling investment securities." Banks were limited to buying and selling the securities "without recourse," and were prohibited from

ducted such securities transactions on a widespread and often interstate basis, without regard to the locational restriction imposed by §5190 on "the usual business of each national banking association." See, *e. g.*, W. Peach, The Security Affiliates of National Banks 74 (1941); Perkins, The Divorce of Commercial and Investment Banking: A History, 88 Banking L. J. 483, 492, 494, n. 26 (1971).[21]   We find it unlikely that Congress, in recognizing and explicitly authorizing this practice, would have undertaken to limit its geographic scope through the branching law without specifically noting the restriction on the prior practice.[22]

---

acquiring the securities of any one issuer in an amount that exceeded 25% of the bank's capital stock.   §2, 44 Stat. 1226.

[21] Respondent treats these prior practices as "immaterial to the issue here" because in the 1920's national banks generally carried out such transactions through affiliates rather than directly owned subsidiaries.   Brief for Respondent 16.   However, it appears doubtful that such securities affiliates were functionally distinguishable from subsidiaries.   Various devices were used to achieve identity of stock ownership between the affiliate and the bank, see W. Peach, The Security Affiliates of National Banks 66–68 (1941), and as a Senate Subcommittee later commented, "it goes without saying that, through identity of stock ownership, there is identity of real control."   Operation of the National and Federal Reserve Banking Systems: Hearings Pursuant to S. Res. 71 before a Subcommittee of the Senate Committee on Banking and Currency, 71st Cong., 3d Sess., 1052, 1057 (1931).   Moreover, at the time it passed the McFadden Act, Congress did not appear to place any particular weight on the affiliate-subsidiary distinction; thus, the legislative history contains references to securities trading as "a type of business which national banks are now conducting under their incidental charter powers."   S. Rep. No. 473, 69th Cong., 1st Sess., 7 (1926); H. R. Rep. No. 83, 69th Cong., 1st Sess., 3 (1926).

[22] Congress did of course later restrict the types of securities transactions in which national banks could engage, through passage of the Glass-Steagall Act in 1933.   See 12 U. S. C. §24 (1982 ed. and Supp. III); 12 U. S. C. §§78, 377, 378.   However, Congress showed no intention of placing geographic restrictions on the location of those securities transactions in which banks could still engage.   Rather, Congress emphasized that the Glass-Steagall Act permitted banks "to purchase and sell investment securities for their customers to the same extent as heretofore."   S. Rep. No. 77, 73d Cong., 1st Sess., 16 (1933).

For the foregoing reasons, we conclude that Congress did not intend to subject a bank's conduct of a securities business to the branching restrictions imposed by 12 U. S. C. § 36(f). We do not view our decision today as inconsistent with our prior decisions interpreting 12 U. S. C. § 36(f) as embodying a policy of "competitive equality" between state and national banks. See, *e. g.*, *First National Bank in Plant City* v. *Dickinson*, 396 U. S. 122 (1969). The Comptroller reasonably interprets the statute as requiring "competitive equality" only in core banking functions, and not in all incidental services in which national banks are authorized to engage.[23] We are not faced today with the need to decide whether there are core banking functions beyond those explicitly enumerated in § 36(f); it suffices, to decide this case, to hold that the operation of a discount brokerage service is not a core banking function.

Accordingly, the judgment of the Court of Appeals is affirmed insofar as it held that respondent has standing, and reversed on the merits.

*It is so ordered.*

JUSTICE SCALIA took no part in the consideration or decision of these cases.

JUSTICE STEVENS, with whom THE CHIEF JUSTICE and JUSTICE O'CONNOR join, concurring in part and concurring in the judgment.

Analysis of the purposes of the branching limitations on national banks demonstrates that respondent is well within the "zone of interest" as that test has been applied in our

---

[23] If the "competitive equality" principle were carried to its logical extreme, the ability of a national bank to carry on an incidental activity such as the safe-deposit business would be limited to the same extent as a state bank's ability to do so under state law. However, as we have noted, *supra*, at 406, the legislative history of the McFadden Act rather clearly indicates that Congress intended national banks to be able to carry on a safe-deposit business without locational restrictions.

prior decisions. Because I believe that these cases call for no more than a straightforward application of those prior precedents, I do not join Part II of the Court's opinion, which, in my view, engages in a wholly unnecessary exegesis on the "zone of interest" test. I do join the remainder of the Court's opinion, which upholds the Comptroller of the Currency's interpretation of the McFadden Act.

Petitioners' argument that respondent lacks standing to challenge the Comptroller's decision in these cases is predicated on their reading of the purpose behind the branching limitations of the McFadden Act. They argue that Congress' *only* concern in not allowing national banks to maintain more branches than their state counterparts may maintain under state law was to ensure that the national banks not use their newly granted branching authority to gain a competitive edge over state banks.[1] Close examination of the Act and its history, however, convinces me that this was not the only purpose of the branching restrictions. Rather, the McFadden Act was in large part a compromise in which Congress started from a general antibranching rule and created a limited exception just large enough to allow national banks to compete effectively with state banks, but also narrow enough to continue to serve the policy of exercising control on the financial power of national banks. The general policy against branching was based in part on a concern about the national banks' potential for becoming massive financial institutions that would establish monopolies on financial services. Petitioners' "zone of interest" argument is therefore predicated on too narrow a reading of the statutory purposes, and hence too narrow a view of the applicable zone of interest that the broad legislative scheme sought to protect.

The National Currency Act of 1863, 12 Stat. 665, and the National Bank Act of 1864, ch. 106, 13 Stat. 99, which provided, *inter alia,* for federal chartering of national banks,

---

[1] See Brief for Federal Petitioner 19–21; Brief for Petitioner in No. 85–972, p. 37.

ended the 57-year hiatus during which there was no federal involvement in banking. The National Bank Act in Rev. Stat. § 5190 provided that "[t]he usual business of each national banking association shall be transacted at an office or banking-house located in the place specified in its organization certificate,"[2] and in 1902 the Comptroller of the Currency stated his view that this statute prohibited national banks from branching. See Annual Report of the Comptroller of the Currency, H. R. Doc. No. 10, Vol. 2, 72d Cong., 2d Sess., 45–47 (1902). In 1911 the Attorney General issued an opinion affirming that view. He explained that neither the statute nor national banks' inherent powers gave them the legal authority to establish branches. *Lowry National Bank*, 29 Op. Atty. Gen. 81, approved in *First National Bank in St. Louis* v. *Missouri*, 263 U. S. 640, 656–659 (1924).

By the early 1900's, some States, most notably California, had begun to authorize their state banks to branch. See J. Chapman & R. Westerfield, Branch Banking 84–92 (1980 reprint); G. Cartinhour & R. Westerfield, Branch, Group and Chain Banking and Historical Survey of Branch Banking in the United States 195–215 (1980 reprint). Controversy soon began to brew over the prohibition on national banks' branching. See Chapman & Westerfield, *supra*, at 92–102. Many argued that it was restraining the national banks too much; not only was it having the salutary effect of preventing the national banks from overpowering other institutions, but it was also having the negative effect of threatening the national banks' vitality by not allowing them to compete fairly with their state counterparts. Others argued that branching was inherently evil and dangerous, and that Congress should certainly not allow national banks to branch, even though Congress might not be able to prohibit States from allowing their banks to engage in branching. See generally C. Col-

---

[2] As amended, this statute appears at 12 U. S. C. § 81.

lins, The Branch Banking Question 2–16 (1926); S. South-worth, Branch Banking in the United States 163–184 (1928).

Congress began to focus on the branch banking issue in 1922, when the Comptroller of the Currency called for legislative action to reduce the competitive disparity. The next five years saw extensive legislative debate on the branch banking crisis and the optimum way to deal with it. See generally Collins, *supra*, at 82–110. As JUSTICE WHITE explains, *ante*, at 401–402, the legislation that was eventually passed in 1927, the McFadden Act, reflected a compromise between these factions. On the one hand, the antibranching group succeeded in preventing a wholesale abandonment of all branching restrictions; on the other hand, the probranching group succeeded in obtaining legislation that would allow national banks to establish branches within the city limits if state banks could do so. See Chapman & Westerfield, *supra*, at 108.[3]

The campaign against unlimited branch banking of national banks was far more than just a campaign to protect the local bank lobby.[4] There was real fear of the effect that a central

---

[3] In their exhaustive survey of branch banking in America, Chapman and Westerfield explained that "[t]he branch bank provisions of the McFadden . . . Act represented the minimum of concession which the anti-branch bank forces were willing to make, and its general purpose was to stifle the development of branch banking and to freeze it in its status quo." See J. Chapman & R. Westerfield, Branch Banking 108 (1980 reprint); see also C. Golembe & D. Holland, Federal Regulation of Banking 1986–87, p. 134 (1986) ("McFadden Act represented a minor victory for branching advocates," and is "probably more correctly viewed as an anti-branching statute"); G. Cartinhour & R. Westerfield, Branch, Group and Chain Banking and Historical Survey of Branch Banking in the United States 285 (1980 reprint) (McFadden Act was "a sort of truce between the interests at issue on the branch bank question").

[4] Protection of state banks for their own sake was, of course, one of the legislative purposes as well. Additionally, it appears that some legislators opposed unlimited national bank branching because they thought that the States would be forced to respond by allowing their banks to branch, an action the legislators were reluctant to force on the States.

bank with unlimited branching power could have on the financial and political climate of the country.[5]   Senator Reed, for example, exclaimed:

> "There are advocates of the general branch bank system. There were advocates of a single national bank, and we had one once, with branches scattered almost everywhere.   It grew so arrogant and so powerful that it dared look 'Old Hickory' Jackson in the eye and tell him it could put up and pull down Presidents, and it required a vast amount of assurance for any capitalist in the world to say that to old Andrew Jackson.   Andrew Jackson struck down the branch bank system, and he lives in song and story, and in the hearts of the American people, because he destroyed an institution that was creating a complete monopoly of credits and of money."   66 Cong. Rec. 4438 (1925).

The McFadden Act's branching limitations were thus geared in part "to prevent monopoly and to prevent an extreme concentration of financial power."   See Hearings on Federal Branching Policy before the Subcommittee on Financial Institutions of the Senate Committee on Banking, Housing, and Urban Affairs, 94th Cong., 2d Sess., p. 408 (1977) (Professor Kenneth Scott explaining various justifications for the Act). It is quite apparent that in the final compromise legislation this view was well represented.[6]   See also *ante,* at 401–402, and n. 16.

---

[5] Given the history of federal involvement in banking it was only natural that this concern would be prevalent.   One of the factors that led to President Jackson's successful "war" against the Second Bank of the United States in 1836 was the fear of the power, financial and political, that a national bank could wield.   See Veto Message of President Jackson, in Senate Journal, July 10, 22d Cong., 1st Sess., 433 (1831); G. Van Deusen, The Jacksonian Era 60–67 (1959); Golembe & Holland, *supra,* at 5.

[6] Some other portions of the McFadden Act provide additional evidence of the antibranching component of the legislation.   For example, the Act stopped "the further extension of state-wide branch banking in the Federal reserve system by State member banks."   H. R. Rep. No. 83, 69th Cong.,

The legislative spirit of maintaining restraints on national banks' branching while allowing them just enough flexibility to compete with state banks was again in force six years later when Congress enacted the Banking Act of 1933 (Glass-Steagall Act), 48 Stat. 162, which allowed national banks to maintain branches outside of their home cities if state banks could. See 12 U. S. C. § 36(c)(1). As the Court explained in *First National Bank* v. *Walker Bank & Trust Co.*, 385 U. S. 252 (1966), the actual impetus for the changes in the branching rules at that time was the Comptroller of the Currency's advocacy of a total elimination of all branching restrictions. See *id.*, at 259 (citing Hearings before a Subcommittee of the Senate Committee on Banking and Currency pursuant to S. Res. No. 71, 71st Cong., 3d Sess., 7–10 (1931)). The proposal engendered the same sort of debate that the McFadden Act had, with some seeking a total lifting of restrictions on branch banking, and others wanting no further relaxation of the restrictions. See, *e. g.*, S. Rep. No. 584, 72d Cong., 1st Sess. (1932); 76 Cong. Rec. 9890–9899 (1932).

In setting out the reasons for their opposition, many Members of Congress described the issue in terms of stopping the undue concentration of financial power. For example, when the Senate Committee on Banking and Currency reported out a bill which would have allowed national banks to establish branches without regard to state law, the minority Report complained:

> "Advocates of the branch-banking system ignore the fact that such a system has never been tried in a country of 120,000,000 population, 3,000 miles across. They ignore the tendency in this country to centralize control of everything, and especially of credit. I believe that the branch-banking system would put us at the mercy of the

---

1st Sess., 7 (1926) (quoted in *First National Bank* v. *Walker Bank & Trust Co.* 385 U. S. 252, 257 (1966)).

financial centers." S. Rep. No. 584, *supra*, at 3 (minority views).

The bill discussed in that Report was not enacted; instead, in the midst of a filibuster by the antibranching forces, another compromise was reached, which continued to contain a general limitation on branching. As one of the conferees explained, "the controversy over the respective merits of what are known as 'unit banking' and 'branch banking systems,' a controversy that has been alive and sharp for years," was not settled. "It is not . . . here proposed to give the advocates of branch banking any advantage." 77 Cong. Rec. 5896 (1933) (remarks of Rep. Luce).[7]

Petitioners therefore misconstrue the statute when they assert that the sole purpose of the restriction on branching was to ensure that national banks not use their new branching power to gain a competitive advantage over state banks, whose branching power was limited by state law. Petitioners argue that the McFadden Act represented a rejection of any earlier or contemporaneous sentiment against branch banking in general, and that the restrictions were merely a throw-in to protect the state banks whose own States may have precluded them from branching. Were that really the case, I would agree that other competitors were merely incidental beneficiaries of the legislation, and that respondent,

---

[7] Similarly, the evidence surrounding passage of the Bank Holding Company Act of 1956, 70 Stat. 133, as amended, 12 U. S. C. § 1841 *et seq.*, which eliminated a "loophole" in the McFadden Act by restricting interstate purchases of banks by bank holding companies, see *Northeast Bancorp, Inc.* v. *Board of Governors, FRS*, 472 U. S. 159, 169 (1985), evinces a legislative purpose that went beyond merely protecting local bank branches. See, *e. g.*, H. R. Rep. No. 609, 84th Cong., 1st Sess., 2 (1955) ("Ultimately, monopolistic control of credit could entirely remold our fundamental political and social institutions"); 101 Cong. Rec. 8030 (1955) (remarks of Rep. Rains) (bill is necessary "to close up and nail down the loopholes in our banking laws—loopholes which threaten not just the local independent bank but the whole traditional banking system as we know it and want to keep it").

which does not represent state banks, would fall outside of the protected zone of interest.

But this argument is not faithful to the actual history. Instead, it is clear that Congress maintained restrictions on branching for all the reasons that have been cited. The exception that was created in 1927 and broadened in 1933 was merely a concession to the reality that unless national banks could establish at least some branches they could not effectively compete with state banks that could legally branch. While protecting state banks from the effects of the new branching power was certainly *one* of Congress' goals, it is equally certain that the legislation also sought to control national banks for the sake of the aforementioned broader competitive interests.[8]

Given this understanding of the multiple purposes behind the branch banking restrictions, this case falls squarely within our decisions in *Association of Data Processing Service Organizations, Inc.* v. *Camp*, 397 U. S. 150 (1970); *Arnold Tours, Inc.* v. *Camp*, 400 U. S. 45 (1970); and *Investment Company Institute* v. *Camp*, 401 U. S. 617 (1971). Just as the Court found in *Association of Data Processing Service Organizations* and *Arnold Tours*, there is embodied in the antibranching rule of the McFadden Act a congressional purpose to protect competitors of national banks in order to ensure that national banks remain limited entities. Although much of Congress' attention focused on national banks' most obvious competititors — state banks — there is no reason to believe that Congress "desired to protect" state

_____

[8] In analyzing current policy toward branch banking, the Department of the Treasury similarly stressed the variety of the issues that are involved: "Several additional issues must be considered in the analysis of geographical restrictions and the prospects of liberalization: competition and concentration, credit availability and service to the local community, the survival of small banks, the safety and soundness of the banking system, and the dual banking system." Department of Treasury, Geographic Restrictions on Commercial Banking in the United States: The Report of the President 12 (1981).

banks "alone from competition." *Arnold Tours, supra,* at 46.

Because I would decide the standing issue on this ground alone, I decline to join the Court's sweeping discussion of the "zone· of interest" test. There will be time enough to deal with the broad issues surrounding that test when a case requires us to do so.