FIRST NATIONAL BANK AND TRUST COMPANY, Piedmont State Bank, Lexington State Bank, Randolph Bank and Trust Company, Bankers Trust of North Carolina, and American Bankers Association, Plaintiffs,

v.

NATIONAL CREDIT UNION ADMINISTRATION, Defendant,

and

AT & T Family Federal Credit Union and Credit Union National Association, Inc., Defendants–Intervenors.

Civ. A. No. 90–2948 SSH.

United States District Court, District of Columbia.

Aug. 9, 1991.

Michael S. Helfer, William J. Kolasky, Jr., Lance W. Edwards, John J. Gill and Michael F. Crotty, Washington, D.C., for plaintiffs.

Vaughn Finn and Theodore C. Hirt, Washington, D.C., for defendant.

Paul Joseph Lambert, Washington, D.C., for defendants-intervenors.

### OPINION

STANLEY S. HARRIS, District Judge.

Plaintiffs, five North Carolina banks and the American Bankers Association, challenge decisions by the National Credit Union Administration (NCUA) approving amendments to the charter of the AT & T Family Federal Credit Union (AT & T Family) expanding its field of membership. They allege that when the NCUA approved the amendments, it acted arbitrarily and capriciously, and violated the statutory requirement under the Federal Credit Union Act, 12 U.S.C. § 1751 *et seq.* (FCUA), that there be a "common bond of occupation or association" among the members of a federal credit union association. Pursuant to 5 U.S.C. § 706 and 28 U.S.C. §§ 2201 and 2202, they ask that various NCUA approvals of applications by AT & T Family be declared null and void and that defendant be enjoined from approving similar amendments to AT & T Family's charter. Now before the court are defendant's motion to

dismiss for lack of standing and plaintiffs' opposition thereto. For the reasons set forth below, defendant's motion is granted, and the case is dismissed.

## BACKGROUND

The Federal Credit Union Act was passed in 1934, in the wake of the Great Depression. After the crash, access to credit had been virtually eliminated for the great majority of the working class: most potential borrowers lacked the security to acquire a loan from a bank, and other licensed money lenders were able to charge extremely high interest rates. S.Rep. No. 555, 73d Cong., 2d Sess. 3 (1934); *see also* 78 Cong.Rec. 7259 (1934). Without access to credit, the nation's lower and middle classes saw their buying power spiral downward. S.Rep. No. 555 at 3.

The establishment of national credit unions, modelled after state supported organizations which had thrived through the economic chaos of the Depression, was seen as a "happy medium" between the loan shark and the bank. 78 Cong.Rec. 7259 (1934). Congress expected that members of credit unions, "with their own money and under their own management," would be able to solve their own credit difficulties. S.Rep. No. 555 at 2. It was hoped that with access to small amounts of funds at reasonable interest rates, national credit unions would return significant buying power to those otherwise unable to have it. *Id.* at 1. Though state-sponsored credit unions fulfilled this need in some areas, Congress felt that the nation would benefit from a federal system because it would be capable of rapid expansion and would permit the creation of credit unions in states that did not previously authorize them. *Id.* at 2, 3.

The credit union is distinctive in that it is the members who own and control the organization. Members purchase shares in the credit union and exercise control over it democratically, irrespective of the number of shares held. 12 U.S.C. §§ 1757(6), 1760 (1988). Loans may be made only to mem-

bers of the organization or to other credit unions. § 1757(5). Each credit union is managed by a board of directors elected annually by and from the members, and no member of the board receives any compensation for these services. § 1761. Supervision and chartering of credit unions is entrusted to the Board of the National Credit Union Administration (NCUA), a three-member panel appointed by the President upon the advice and consent of the Senate. §§ 1752a, 1754, 1756.

At issue in this case is § 109 of the FCUA, now codified at 12 U.S.C. § 1759, which provides that members of a credit union must share "a common bond" of occupation, association, or location. The NCUA has defined a common bond as:

> the sharing of some unifying factor or characteristic among persons that simultaneously links them together and distinguishes them from the general public. This unifying factor must be something more than an unfocused, generalized agreement on a given topic, or a common belief or philosophy on matters of general concern.

45 Fed.Reg. 8285 (1980).

In recent years the NCUA has interpreted the common bond requirement to allow a number of occupational or associational groups to form a credit union if each group shares its own common bond. *See* 12 C.F.R. § 701.1 (1991); 54 Fed.Reg. 31,169 (1989). Plaintiffs challenge decisions by the NCUA approving applications by AT & T Family to expand its membership to include employee groups that have a separate common bond from the AT & T employee group. Defendant moves to dismiss for lack of standing to sue under the FCUA, and is joined in that motion by intervenors AT & T Family and Credit Union National Association, Inc.

## DISCUSSION

The Administrative Procedure Act (APA) grants standing to anyone "adversely affected by agency action within the meaning of the relevant statute." [1] 5 U.S.C. § 702.

---

1. In order to bring their claim, plaintiffs must

show that they have both constitutional and

In *Association of Data Processing Service Organizations v. Camp,* the Supreme Court explained that a party meets this standard if "the interest sought to be protected by the complainant is arguably within the zone of interests to be protected or regulated by the statute ... in question." 397 U.S. 150, 153, 90 S.Ct. 827, 830, 25 L.Ed.2d 184 (1970). Since *Data Processing,* the "zone of interests" test has been the standard by which the Court has judged questions of standing under § 702 of the APA.

The Court clarified what it means for a complainant to be within the "zone of interests" of a statute in *Clarke v. Securities Industry Ass'n,* 479 U.S. 388, 107 S.Ct. 750, 93 L.Ed.2d 757 (1987). The ultimate inquiry, it asserted, is centered upon congressional intent. *Id.* at 399, 107 S.Ct. at 757. In view of Congress's evident intent to make agency action presumptively reviewable, a plaintiff has standing only if Congress intended for that particular class of plaintiffs to be relied upon to challenge agency action allegedly in disregard of the law. *Id.* The goal of the test is to exclude those plaintiffs who are more likely to frustrate than to further statutory objectives. *Id.* at 397, n. 12, 107 S.Ct. at 756, n. 12. In cases where a party is the subject of the contested regulation, it is clear that Congress intends for that party to be able to act as a "private attorney general" through bringing a suit to enforce the statute. *Id.* at 399, 107 S.Ct. at 757. But when not the subject of the statute, a party will be denied review if its interests are "so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be presumed that Congress intended to permit the suit." *Id.* at 399–400, 107 S.Ct. at 757.

Though the test is not meant to be especially demanding and there need be no explicit indication of congressional purpose to permit the suit, there are occasions where the requisite congressional intent is not present. *Id.* The Court provided a hypothetical example of such a case in *Lujan v. National Wildlife Federation,* —— U.S. ——, 110 S.Ct. 3177, 3186, 111 L.Ed.2d 695 (1990):

> [T]he failure of an agency to comply with a statutory provision requiring "on the record" hearings would assuredly have an adverse effect upon the company that has the contract to record and transcribe the agency's proceedings; but since the provision was obviously enacted to protect the interests of the parties to the proceedings and not those of the reporters, that company would not be "adversely affected within the meaning" of the statute.

Such a company certainly would have Article III standing because it would have suffered an injury-in-fact which is fairly traceable to the agency action, but it would not meet the heightened requirement of prudential standing as defined by the APA. It simply is not the type of challenge which Congress would have imagined when it passed the statute. *See also Air Courier Conference of America v. American Postal Workers Union, AFL–CIO,* —— U.S. ——, 111 S.Ct. 913, 112 L.Ed.2d 1125 (1991) (union representing Postal employees does not have standing to challenge the Postal Service's suspension of a statute designed to preserve adequate revenues for the Service.).

■ The D.C. Circuit has had occasion to clarify this standard further. Those not regulated by an agency have standing only if they are the intended beneficiaries of the specific statute or are nonetheless "suitable challengers" to the statute because their interests coincide with the interests which Congress did intend to protect. *Hazardous Waste Treatment Council v.*

---

prudential standing. *See National Federation of Federal Employees v. Cheney,* 883 F.2d 1038, 1041 (D.C.Cir.1989), *cert. denied,* —— U.S. ——, 110 S.Ct. 3214, 110 L.Ed.2d 662 (1990). To establish constitutional standing, a plaintiff must allege an injury-in-fact which is fairly traceable to the conduct complained of and likely to be redressed by the relief requested. *See*

*Allen v. Wright,* 468 U.S. 737, 104 S.Ct. 3315, 82 L.Ed.2d 556 (1984); *Valley Forge Christian College v. Americans United for Separation of Church and State,* 454 U.S. 464, 102 S.Ct. 752, 70 L.Ed.2d 700 (1982). Because the court dismisses the amended complaint for lack of prudential standing, it need not address the issue of Article III standing.

*Thomas,* 885 F.2d 918, 924 (D.C.Cir.1989) (*HWTC IV*). A party is a suitable challenger if its interests coincide systematically, and not simply fortuitously, with the interests of those whom Congress intended to protect. *Id.; Hazardous Waste Treatment Council v. United States Environmental Protection Agency,* 861 F.2d 277, 283 (D.C.Cir.1988), *cert. denied,* 490 U.S. 1106, 109 S.Ct. 3157, 104 L.Ed.2d 1020 (1989) (*HWTC II*).

■ The legislative history of the FCUA makes it clear that the Act was passed to establish a place for credit unions within the country's financial market, and specifically not to protect the competitive interest of banks. As noted, credit unions were seen as a "happy medium" between the loan shark and the bank at a time when neither could satisfy the normal credit needs of the working class. 78 Cong.Rec. 7259 (1934). Further, Congress concluded that commercial banks were not in a position to make funds available to those of small means who generally had no security for loans. *Id.* Against this backdrop, it would defy logic to assume that Congress, in passing the FCUA, wanted to protect the interest of banks.

Nor was the common bond requirement included in the Act to protect banks. Instead, it was designed to ensure that credit unions remain responsive to those they were designed to serve. A major selling point for the FCUA was the outstanding record of state credit unions through the Depression, a record which was attributed to their democratic control, honest management, and faithful service to members. Sen.Rep. No. 555 at 2. It was largely through its limitation of membership to those with a common bond that credit unions were thought to fulfill this democratic ideal. *Barany v. Buller,* 670 F.2d 726, 734

(7th Cir.1982); *La Caisse Populaire Ste. Marie v. United States,* 563 F.2d 505, 509 (1st Cir.1977). Such an arrangement was supposed to make credit unions "incapable of exploitation." Sen.Rep. No. 555 at 3. For their part, plaintiffs can cite nothing in the legislative history of the FCUA to buttress their assertion that the common bond requirement was designed to protect banks.[2]

Having shown that Congress did not have in mind the competitive interests of banks when it enacted the common bond requirement, it is a short step to conclude that neither are banks suitable challengers to actions taken under the authority of the FCUA. As this case shows, the interests of banks will rarely if ever coincide with those of credit unions, the interest which Congress did intend to protect, because both compete for the same business. Any coincidence of interest would be at best fortuitous. Thus, because they are neither intended beneficiaries nor suitable challengers, commercial banks are not within the zone of interests which Congress intended to protect when it passed the FCUA.

This position is in keeping with D.C. Circuit decisions on the subject of prudential standing. In *HWTC IV* and *HWTC II,* the court found no standing for waste treatment companies which suffered competitive injury and challenged the regulatory structure for the safe treatment, storage, and disposal of hazardous wastes. Because those regulations were designed to protect human health and the environment and not to improve the business opportunities of waste treatment companies, the court was unwilling to infer that Congress intended for such companies to be able to challenge the regulations. *HWTC IV,* 885 F.2d at

---

**2.** Plaintiffs point only to a statement made during a hearing regarding a credit union authorization for the District of Columbia two years before the FCUA to support their argument. *See* Plaintiff's Motion of Points and Authorities in Opposition to Defendant's Motion to Dismiss at 12. The speaker mentioned in passing that amendments to the D.C. bill had been proposed after considering the suggestions of the Bankers' Association of the District of Columbia. Even if this court were to accept the legislative history of the D.C. statute as evidence of congressional intent with regard to the federal statute, it is hardly convincing evidence that Congress was trying to protect the interests of commercial banks when it enacted the common bond requirement. In fact, the passage cited emphasizes that the primary concern in authorizing credit unions was that they be successful.

924; *HWTC II*, 861 F.2d at 283. Nor did their interests coincide with the interests Congress intended to protect to the point at which they could nonetheless be seen as "suitable challengers" to the regulations. *HWTC IV*, 885 F.2d at 924; *HWTC II*, 861 F.2d at 283. In either case, the fact that firms are benefitted by congressional action, like the court reporters in *Lujan v. National Wildlife Federation* and like the commercial banks in this case, does not mean that an agency decision with regard to that decision confers standing. *Id.; see also National Federation of Federal Employees v. Cheney*, 883 F.2d 1038 (D.C.Cir. 1989), *cert. denied,* —— U.S. ——, 110 S.Ct. 3214, 110 L.Ed.2d 662 (1990) (organization of federal employees lacks standing to contest the Army's decision to contract out certain services as violative of statutes designed to coordinate budgeting procedures and increase efficiency in government operations.).

The Fourth Circuit reached the same conclusion when presented with facts virtually identical to these. In *Branch Bank & Trust Co. v. National Credit Union Administration*, 786 F.2d 621 (4th Cir.1986), *cert. denied*, 479 U.S. 1063, 107 S.Ct. 948, 93 L.Ed.2d 997 (1987), the court found no standing for banks to challenge application of the common bond requirement:

> [T]he general purposes of the Act, rather than indicating a desire to protect banks, instead suggest that competitive interests of banks were purposely sacrificed by Congress to the interests of facilitating credit for people of limited personal means.... [T]he common bond provision was designed to ensure the cohesive operation of credit unions rather than to limit their reach in an effort to protect banks.

*Id.* at 626.

Given this specific rationale for the common bond requirement, the court was unwilling to attribute to it a meaning at odds with the general goals of the statute. *Id.*

This court shares the Fourth Circuit's basic conclusion.

Plaintiffs erroneously rely on a string of cases in which the Supreme Court has found standing where a group or business has suffered a competitive injury due to agency action. *See Clarke*, 479 U.S. 388, 107 S.Ct. 750, 93 L.Ed.2d 757 (1987); *Data Processing*, 397 U.S. 150, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970); *Arnold Tours, Inc. v. Camp*, 400 U.S. 45, 91 S.Ct. 158, 27 L.Ed.2d 179 (1970); *Investment Co. Institute v. Camp*, 401 U.S. 617, 91 S.Ct. 1091, 28 L.Ed.2d 367 (1971). Contrary to plaintiffs' assertion, all of these cases involve statutes directed at restricting entry into a given field or business. Even in *Clarke*, where a trade association representing securities brokers asserted that a decision to allow two national banks to open a discount brokerage operation violated anti-branching laws, the Court found standing because the statute was passed in part due to congressional fear that national banks might obtain monopoly control of credit and money if permitted to branch unrestricted. 479 U.S. at 402, 107 S.Ct. at 758. Because those plaintiffs' members competed with banks in providing discount brokerage services, the Court found that Congress arguably had legislated against the competition that plaintiffs sought to challenge. *Id.* at 403, 107 S.Ct. at 759. This intent to restrict entry was what made plaintiffs "very reasonable candidates to seek review." *Id.* As noted, Congress had no such intent when it passed the FCUA.

## CONCLUSION

For these reasons, the court finds that plaintiffs lack prudential standing to challenge the action of the NCUA. Accordingly, defendant's motion to dismiss is granted and the case is dismissed.