724 F.Supp. 548 (1989)
BOARD OF TRADE OF the CITY OF CHICAGO, Plaintiff,
v.
COMMODITY FUTURES TRADING COMMISSION, Defendant.
No. 89C4300.
United States District Court, N.D. Ill., E.D.
September 27, 1989.
*549 Garrett B. Johnson, Mark D. Young, Susan C. Brown, Kirkland & Ellis, Scott E. Early, CBOT, Chicago, Ill., for plaintiff.
James Curt Bohling, CFTC, Washington, D.C., William Clabault, Asst. U.S. Atty., Chicago, Ill., for defendant.

MEMORANDUM OPINION AND ORDER
SHADUR, District Judge.
Board of Trade of the City of Chicago ("CBOT") has sought, by way of declaratory judgment and injunctive relief, judicial review of a decision by Commodity Futures Trading Commission ("CFTC") to reduce a penalty imposed by CBOT on one of its members. Both parties have moved for summary judgment under Fed.R.Civ.P. ("Rule") 56. In the alternative, CFTC has moved to dismiss the Complaint under Rules 12(b)(1) and (6). For the reasons stated in this memorandum opinion and order:
1. CFTC's motion to dismiss is denied.
2. Each party's motion for summary judgment is granted in part and denied in part.

Procedural History
CBOT is a federally regulated exchange providing markets for trading futures and options on futures.[1] On August 28, 1984 it issued a decision (the "Decision") finding one of its members, Lawrence Malato ("Malato"), had committed 12 violations of CBOT Rules and Regulations during five separate episodes of illegal trading.

Episode 1
On May 19, 1983[2] Malato received customer orders to sell 225 December 1983 United States Treasury Bonds ("December Bonds") "on the close" (at the end of the daily trading session) within the closing price range. At 1:49 p.m. (about 10 minutes ahead of schedule) Malato began to execute those orders: He sold 50 December Bonds to Gedon Hertschten ("Hertschten") at 75.15[3] and 35 December Bonds to Thomas Morrow ("Morrow") at the same price.
Quickly realizing his mistake, Malato attempted to "bust" (break) those trades. *550 Morrow agreed but Hertschten refused. Some minutes later Morrow sold 50 December Bonds to Malato at 75.15, effectively matching the Hertschten trade. On the close Malato was able to sell 85 December Bonds to Morrow at 75.10, thus providing Morrow with a $7,812.50 profit on the 50 bonds he had earlier sold to Malato. After the close Malato arranged with Hertschten and Morrow for the transaction to appear as if Morrow had sold 50 December Bonds to Hertschten at 75.15.
Morrow's sale of 50 December Bonds to Malato occurred without an offer by "open outcry" to all traders in the pit. Additionally, because of the actions and statements by Malato, Morrow and other traders in the pit knew that Malato was holding a large number of sell orders for December Bonds.
Telescoping Malato's transactions reveals the effective substitution of a 50-bond sale at 75.10 (to Morrow) for an earlier like sale at 75.15 (to Hertschten). Thus CBOT found Malato's customers suffered to the tune of $7,812.50 through his coverup of the misexecuted trade.

Episode 2
On June 7 Morrow was holding customer orders to sell 5 December Bonds at the market and to buy 10 December Bonds at 74.00. Before executing those orders he disclosed them to Malato. As an accommodation to Morrow, Malato then bought from him 5 December Bonds at 74.00 and sold him 5 December Bonds at 74.00.

Episode 3
On June 7 Morrow was also holding customer orders to sell 6 December Bonds at the market and to buy 2 December Bonds at 74.00 or better. As before, he disclosed those orders to Malato before executing them. As an accommodation to Morrow, Malato then bought 2 December Bonds at 73.31 and sold him 2 December Bonds at 74.00.

Episode 4
On June 17 Malato was holding two customer limit orders, one to buy 25 June Bonds at 76.13 and one to sell 25 June Bonds at 76.14. Before executing those orders Malato disclosed them to Shelley Squire ("Squire"). As an accommodation to Malato, Squire bought from and sold to Malato 20 June Bonds at 76.13.

Episode 5
On June 27, Squire was holding a customer stop order to sell eight March 84 Bonds at 72.22. Squire disclosed the order to Malato before executing it. Later, when 72.23 was being bid, Squire sold the eight bonds to Malato for his personal account at 72.22.

* * *
As to all five episodes, CBOT found Malato had violated its Regulation prohibiting accommodation trading. CBOT also found the following activities were in violation of its Rules and Regulations:
Episode 1:  failing to execute an order competitively by open outcry on the open market (Rule 232.00)
 disclosing that he was holding the orders of other persons (Reg. 350.05(d))
 engaging in prearranged trading (Reg. 350.05(f)).
Episode 4:  failing to execute orders competitively by open outcry on the open market
 disclosing that he was holding the orders of other persons.
All in all CBOT found 12 individual violations. Finally CBOT found Malato had violated its Rules in that (1) his conduct "demonstrated a pattern of concerted trading activity with [] Morrow and [] Squire which was anti-competitive in nature" and constituted "dishonorable and dishonest conduct inconsistent with just and equitable principles of trade" (Rule 500.00) and (2) "he engaged in acts detrimental to the interest and welfare of the Association" (Rule 504.00).
CBOT's Board of Directors fined Malato $50,000 and voted to suspend Malato from membership for seven years effective September 10, 1984. Malato appealed to CFTC, which reviewed the decision in "Malato I" (In re Malato, [1986-87 Transfer Binder] Comm.Fut.L.Rep. (CCH) ¶ 24,084).
Malato I at 34,703-06 held CBOT had committed a number of procedural errors *551 in violation of its own rules and Title 17 of the Code of Federal Regulations. Although it found many of the findings of violations did not ultimately prejudice or harm Malato, CFTC did vacate four of the individual violations: all three of the Episode 4 violations (on a procedural rather than substantive ground) and the finding of accommodation trading in Episode 1.
Malato I also brought out some interesting facts. Apparently Malato and Morrow had a working relationship (although not necessarily a partnership) in which they shared brokerage business. Usually Malato acted as a sell broker and Morrow acted as a buy broker, although that was not always the case (as the episodes in question reflect). Squire was a "protege" of Malato who had been trading for less than six months at the time of the episodes in which she was involved.
In evaluating the Decision, CFTC examined whether it "ha[d] a reasonable basis in fact" (Malato I at 34,706). Where there were credibility disputes CFTC left their resolution to CBOT and said it does not "second-guess" CBOT (id. at 34,707). CFTC also said (id. at 34,708):
As experienced professionals cognizant of the customs in the pit, the members of [CBOT's] Floor Governors Committee are in the best position to draw inferences from the evidence presented to them.
CFTC also examined the severity of the sanctions. Malato claimed he was treated far more harshly than the others involved in the episodes. CFTC recognized that CBOT had recently imposed similar sanctions in other cases, though not in the companion cases in this instance (id.). But CFTC did not determine the appropriateness of the sanctions. Instead, in light of its having vacated four of the violations, it remanded the case to CBOT for determination of an appropriate sanction in terms of the relevant factors CFTC had recently set out in another case, In re First Commodity Corp. of Boston [1986-87 Transfer Binder] Comm.Fut.L.Rep. (CCH) ¶ 23,694 at 33,801-02.

Supplemental Decision
On February 16, 1988 CBOT issued its decision on remand (the "Supplemental Decision") in accordance with Malato I. Supplemental Decision at 3 first set out the appropriate factors from First Commodity to determine the appropriate sanctions:
the gravity of the offenses; whether the penalty will be sufficiently remedial to deter future violations by the respondents and others; the number and kinds of other violations engaged in by the respondent, if any; the size of the respondent's business; and the extent of the respondent's ability to continue in business.
Although CBOT questioned the status of those guidelines (Supplemental Decision at 4 n. 4), it explicitly followed them. It found:
1. Malato's violations were serious  he deprived a customer of a $7,812.50 profit to which the customer was entitled, and he cheated all market participants through his accommodations trading.
2. Based on the remaining four instances of illegal trading (two involving customer orders), a substantial penalty was warranted to deter similar conduct in the future.
3. Because Malato's conduct was of a "systematic nature," it was in order to impose more severe sanctions than an isolated occurrence would call for.
4. Malato's business  grossing $20,000 to $25,000 per month  made the $50,000 fine appropriate.
5. Malato's ability to continue in business was immaterial, because the effect and intent of CBOT's sanction was to bar him from business for seven years.
In comparing Malato's sanctions with those of his confederates, CBOT found:
1. Heavier sanctions than Morrow's were appropriate because Malato was the instigator of the violations and he breached a duty not to deprive a customer of a profit, while Morrow did not.
2. Heavier sanctions than Squire's were appropriate because Malato's violations were far more serious and Squire *552 was an inexperienced trader who was being trained by Malato.
CBOT therefore affirmed its original imposition of a $50,000 fine and seven year suspension.

Malato II
Malato then sought relief from the claimed excessive sanctions before CFTC. On May 2, 1989 CFTC ordered CBOT to return the fine (together with accrued interest) and reduced Malato's suspension to time served (Malato v. CBOT, CFTC Docket No. 88-E-6 (May 2, 1989)) ("Malato II").
CFTC began Malato II with lengthy discussions about the history of the case and about CFTC's appropriate standard of review both of the Decision in Malato I and of the Supplemental Decision. CFTC then turned to a review of CBOT's justifications for reimposition of its original sanctions.
CFTC disputed CBOT's conclusion that Malato's conduct specifically harmed his customers in Episode 1 (Malato II at 25). Malato II, id. reiterated (from Malato I) that Malato's apparent motivation in neutralizing his premature filling of the "market on close" orders was not to profit from his customers, but rather to assure that his reputation for good execution of orders was protected. It therefore concluded that no specific harm to customers resulted.
Malato II also rejected CBOT's justifications for the different level of sanctions imposed on Malato. Instead Malato II found:
1. It was impossible to conclude that only Malato and not Morrow owed a duty to his customers. CFTC stated that on the record "there is no reasonable basis to distinguish Morrow's customers from Malato's customers"  Morrow and Malato regarded themselves as partners and shared customers without regard to their identity.
2. Nor did the evidence support the conclusion that Malato was the instigator of the violations with Morrow. Apart from the May 19 episode, CFTC noted that the other accommodation trades were initiated by Morrow.

3. Malato's violations might well be more than mere isolated instances of bad judgment, but they were not "systematic," if by that CBOT indicated the existence of premeditation.
Malato II at 26-27 therefore concluded that CBOT's explanations did not justify the reimposition of the same sanctions as originally prescribed. As a separate ground for reversal, CFTC found that such reimposition after CFTC's elimination of four of the 12 original individual violations raised an inference that the original imposition must have been viewed by CBOT as too lenient. CFTC could not reconcile that inference with the relative severity of the original sanctions. It concluded that the reimposition was "arbitrary rather than reasoned" and thus inconsistent with the policies of the Act.
To bring about a final resolution of this matter, Malato II declined to remand yet again to CBOT, instead remitting the fine (plus interest) to Malato and commuting his suspension to time served. CFTC rejected a motion to reconsider its decision, and the current lawsuit ensued.

Positions of the Parties
CBOT contends CFTC exceeded its role in reviewing the disciplinary action against Malato. As CBOT would have it, CFTC may set aside or modify a disciplinary action only "after a determination on the record [that] the action of the exchange was not in accordance with the policies of [the Act]" (Section 12c(3)). CBOT claims (1) its actions were fully in accord with the policies of the Act and (2) Malato II erred in disputing CBOT's findings. CBOT also claims CFTC's substitution of its own sanctions was arbitrary and capricious.
CFTC first responds that CBOT does not have standing to challenge Malato II. CFTC then further asserts its action was a proper exercise of its discretion and must therefore be affirmed by this Court.
This opinion will of course first address the standing issue. When that question is resolved (an easy task), this Court will turn to the proper standard of review of CFTC's decision.

*553 Standing[4]
CBOT seeks review of Malato II pursuant to Administrative Procedure Act ("APA") § 10(a), 5 U.S.C. § 702:
A person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof.
CFTC urges that CBOT lacks Article III standing to sue because of the absence of the dual requirement of a "distinct and palpable injury" and a "`fairly traceable' causal connection between the claimed injury and the challenged conduct" (Duke Power Co. v. Carolina Environmental Study Group, Inc., 438 U.S. 59, 72, 98 S.Ct. 2620, 2630, 57 L.Ed.2d 595 (1978)).[5]
CFTC says only Malato has a direct stake in the appeal of CFTC's decision. CFTC Mem. 9 n. 8[6] focuses on the real crux of its argument: It sees CBOT as a "quasi-judicial body" seeking vindication in the "appellate disposition of its sanctions." And much as a District Court judge is ordinarily viewed as having no standing to appeal to the Supreme Court from a reversal by a Court of Appeals,[7] CBOT is said to have no standing here to appeal CFTC's decision.
But that view is too narrow. It is not merely the "quasi-judicial body" that is appealing Malato II  it is the entire CBOT as such. Malato II not only invades CBOT's coffers to the tune of over $70,000 but also forces CBOT to reinstate a member whom it still considers unfit to conduct business. Each of those effects (and they are the effects directly challenged in this Court) constitutes a "distinct and palpable injury" under any legitimate view.
CFTC R.Mem. 3 n. 1 effectively concedes (as it must) that the remittal of the fine constitutes injury. And neither party fully addresses the second impact  the injury to CBOT by Malato's reinstatement. But it is clear, as CBOT R.Mem. 3-4 points out, that CBOT is required by law to discipline and supervise its membership (Sections 7a(8) and 12c). CFTC's decision effectively reduces CBOT's ability to self-regulate and  if CBOT is right  impairs not only its integrity but potentially the public's perception of that integrity as well. Such non-economic injury confers standing too (cf. Sierra Club v. Morton, 405 U.S. 727, 734, 92 S.Ct. 1361, 1366, 31 L.Ed.2d 636 (1972) (non-economic harm, such as injury to aesthetic or environmental interests important to quality of life, may be legally protected)). In sum, CBOT clearly has standing to challenge CFTC's decision.[8]

Standard of Review
*554 This Court reviews Malato II[9] under the standards prescribed in APA § 10(e), 5 U.S.C. § 706:
The reviewing court shall  ...
(2) hold unlawful and set aside agency action, findings and conclusions found to be 
(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law....
Cowherd v. HUD, 827 F.2d 40, 42 (7th Cir.1987), quoting Motor Vehicle Manufacturers Association of the United States, Inc. v. State Farm Mutual Automobile Insurance Co., 463 U.S. 29, 42, 103 S.Ct. 2856, 2866, 77 L.Ed.2d 443 (1983), elaborates:
Under the arbitrary and capricious standard, a reviewing court will uphold agency action that is "rational, based on consideration of the relevant factors, and within the scope of the authority delegated to the agency by the statute."
"In examining the administrative record, we must be mindful that agency action is given a `presumption of regularity'" (id., citing Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 415, 91 S.Ct. 814, 823, 28 L.Ed.2d 136 (1971)).
Sections 12c(2) and (3) prescribe the "scope of the authority delegated to the agency" in this instance:
(2) The Commission may, in its discretion and in accordance with such standards and procedures as it deems appropriate, review any decision by an exchange whereby a person is suspended, expelled, otherwise disciplined, or denied access to the exchange. In addition, the Commission may, in its discretion and upon application of any person who is adversely affected by any other exchange action, review such action.
(3) The Commission may affirm, modify, set aside, or remand any exchange decision it reviews pursuant to paragraph (2) of this section, after a determination on the record whether the action of the exchange was in accordance with the policies of this chapter. Subject to judicial review, any order of the Commission entered pursuant to paragraph (2) of this section shall govern the exchange in its further treatment of the matter.
In addition, CFTC has promulgated its own regulations for conducting review in 17 C.F.R. § 9.33(c):
In reviewing an exchange disciplinary, access denial or other adverse action, the Commission will consider whether:
(1) The exchange disciplinary, access denial or other adverse action was taken in accordance with the rules of the exchange;
(2) Fundamental fairness was observed in the conduct of the proceeding resulting in the disciplinary, access denial or other adverse action;
(3)(i) In the case of a disciplinary action, the record contains substantial evidence of a violation of the rules of the exchange, or (ii) in the case of an access denial or other adverse action, the record contains substantial evidence supporting the exchange action; and
(4) The disciplinary, access denial or other adverse action otherwise accords with the Act and the rules, regulations and orders of the Commission thereunder.
It is in accordance with those guidelines that this Court must examine CBOT's contentions that Malato II erred in reversing the following findings:
1. that Malato specifically harmed his customers by cheating them out of a $7,812.50 profit;
2. that Malato instigated the May 19 Episode (Episode 1);
3. that Malato alone breached a fiduciary duty to customers; and
4. that reimposition of the original penalty in the wake of Malato I was proper.[10] *555 CBOT also says CFTC's reduction of the penalty was arbitrary and capricious.

Specific Harm to Customers
There is no dispute as to the facts of Episode 1. Here is the May 19 chronology:
1. At 1:49 p.m. Malato erroneously executed a customer order to sell 50 December Bonds to Hertschten at 75.15.
2. Almost immediately Morrow sold 50 December Bonds back to Malato at 75.15, effectively restoring Malato (though not Morrow, of course) to his original position.
3. On the close (about 1:59 p.m.) Malato sold 50 December Bonds to Morrow at 75.10, providing Morrow with a $7,812.50 profit on his two trades.
CBOT argues that Malato deprived his customers of that profit.
Both parties inexplicably ignore what appear to be other relevant facts of Episode 1:
1. At approximately 1:49 p.m. Malato also sold 35 December Bonds to Morrow at 75.15.
2. Moments later, Morrow "busted" the trade. Effectively Morrow sold those bonds right back to Malato.
3. On the close, Malato sold a total of not 50 but 85 bonds (thus reselling the 35 bonds involved in the busted trade) to Morrow at 75.10.
Didn't Morrow realize an additional $5,468.75 profit from that sequence? After all, had Malato not acted to revoke the original sale (presumably because it did not conform to his customers' orders), Morrow would have owned 35 December Bonds at the higher original cost. And because the commodity futures market is a zero-sum game,[11] there was a corresponding profit (measured by the difference between the 75.15 and 75.10 prices) that belonged to someone.[12]
Whether only the 50 bond sequence is looked at or whether the transactions involving the additional 35 bonds are considered as well, what matters is whether Malato was stuck with his premature trades when he made them. CBOT found he should have been  if the price later rose he would have had to eat the loss, and if it dropped the customers would have reaped the benefit of his having sold early.[13] CFTC took a different slant by concluding that Malato was merely trying to protect his reputation and limit his liability were the market then to rise on the close.
Both positions are reasonable. However, CFTC's point that a market rise (rather than the drop that actually occurred) in the 10 minutes remaining to closing would have benefited Malato's customers tends to undercut CBOT's conclusion that he cheated his customers. "Cheating," as used in Section 6b, requires an intentional act (though not necessarily an evil motive) or an action with careless disregard for the statutory requirements (CFTC v. Savage, 611 F.2d 270, 283 (9th Cir.1979), citing Seventh Circuit cases so holding). CFTC could reasonably conclude that where Malato acted swiftly in an attempt to correct his actions, leaving it to the actual market movement to give his customers exactly what they bargained for, no violation was involved.
CBOT now stresses that CFTC glossed over (or ignored) CBOT's other findings *556 that Malato acted wrongfully in disclosing his orders before execution. That might support an argument that Malato's predisclosure would have the effect of depressing the price, so that his postponing the real sale would necessarily result in a customer loss. But nothing in the record suggests that CBOT had actually reasoned in that way. Nor does the record contain any basis (other than speculation) to indicate that the price for the 85 December Bonds Malato sold at the close would in fact have been any higher in the absence of Malato's premature disclosure. CBOT's attack on CFTC's ruling in this area as "arbitrary" cannot succeed.
CBOT R.Mem. 7-10 also urges Malato's predisclosure is evidenced of "front-running." Again no CBOT decision ever presented this rationale.[14] Nor does the record support such a finding. In front-running a trader discloses his orders so a confederate may profit by "trading ahead"  selling when the disclosed orders will then depress the market, or buying when those orders will raise prices. Nothing here indicates such activity.[15]
It must be concluded that CFTC's finding that Malato did not cause specific harm to customers was not arbitrary or capricious or not in accordance with law  even though a decision by CFTC upholding CBOT's contrary determination might also have been held nonarbitrary. CBOT cannot prevail on that issue.

Instigation of the Violations
Malato II at 25 rejected the finding of Supplemental Decision at 5 that Malato instigated the violations with Morrow (thus justifying Malato's being saddled with heavier sanctions than Morrow). Malato II examined the record and concluded that Malato may have instigated Episode 1 but that Episodes 2 and 3 were at Morrow's behest. There can be no argument about that  the facts unquestionably bear out that conclusion in Malato II.
Malato II dealt with the "instigator" issue only in weighing the relative sanctions as between Morrow and Malato. Because this opinion determines that CFTC was not arbitrary in deciding that (1) Episode 1, instigated by Malato, did not cause specific harm to customers but involved multiple (three) violations affirmed by Malato I and (2) Morrow instigated the other two Episodes, CFTC was also not arbitrary in concluding that "instigation" is not now a sound component of a decision imposing substantially disparate sanctions on Malato.[16]

Fiduciary Duty
Malato II also overturned CBOT's finding that Malato alone and not Morrow breached a fiduciary duty to customers in Episode 1. Malato II at 24 did not examine the nature of the duty owed, but rather noted that no "meaningful distinction" was made by CBOT as between Malato's customers and Morrow's customers, so that there was "no basis in the record to distinguish Morrow's culpability from Malato's culpability."
That simply does not bear scrutiny. Because CFTC never makes clear the nature of the fiduciary duties involved in its attempted analysis, its conclusion is at least *557 suspect and at most unsupportable. By contrast, CBOT does identify the violation of such a specific duty  the duty not to disclose an order. And on that score it is quite irrelevant that Malato and Morrow shared customers, for they could not both have breached that duty on the scenario presented to CBOT and then CFTC. Both as a general rule and in the episodes at issue here, Malato acted only as a sell broker and Morrow acted only as a buy broker (Malato I at 34,701). Only Malato had the sell orders in this case placed with him  only he could have committed (and did commit) the breach of the nondisclosure duty. Nothing supports the speculative supposition that Morrow could have been equally culpable.
What CFTC has done is to turn the burden of justification of CBOT's conclusion on its head. There was indeed a rational basis in the record for CBOT's finding of different culpability; conversely, there was none to suggest identical culpability as to the fiduciary duty on which CBOT relied. CFTC's bald statement that no duty could be breached by Malato and not by Morrow as well is arbitrary and unsupported by the evidence.[17]

Reimposition of Sanctions
Malato II at 26 found CBOT's sanctions were excessive in light of CFTC's several reversals of CBOT's findings. To determine whether that conclusion should be labeled arbitrary, it must be reexamined in light of the just-announced reversal of CFTC's fiduciary-duty reversal.
But that reexamination is also compelled by other serious flaws in what CFTC has said and done here. Because of the need for remand, this opinion turns to a brief additional description of CFTC's approach, then to the obvious defects that call for a fresh reappraisal.
Malato II at 27 also found what CFTC considered an independent ground for vacating CBOT's reimposition of the identical sanctions previously levied against Malato. CFTC found that such an identity of result was highly suspicious once Malato I had reduced the number of rule violations from 12 to 8. For that purpose CFTC sought to employ a sort of reductio ad absurdum analysis: If the same results flowed from fewer violations, that meant the original sanctions had been too lenient  but that notion was incredible because the original sanctions were "among the most severe ever imposed by CBOT."
For one thing, CFTC's current statement as to the extraordinary severity of the sanctions contrasts sharply with the finding of Malato I at 34,708 that "similar sanctions have recently been imposed in other cases." At a minimum CFTC must reconcile or explain its shift in perspective if it is not to be labeled arbitrary itself.
Moreover, Malato I specifically prescribed the First Commodity factors for CBOT to apply on remand. Supplemental Decision at 3-7 just as clearly restated those factors and both analyzed and justified the full reimposition of sanctions under each of those factors. Yet after CBOT had thus meticulously followed CFTC's instructions, Malato II found CBOT's conclusion "unexplained." Such a disturbing statement plainly deserves the label of arbitrariness.
Finally, one of the risks of reductio ad absurdum arguments is that the purported absurdity at the end of the analysis may not be absurd at all. CFTC is simply wrong in ruling as a matter of law that Malato I's vacation of some (though by no means all) of the findings of Malato's violations mandated a reduction in sanctions. Courts have often sustained a reimposition of original sanctions after underlying findings have been reversed, as long as an adequate and reasonable explanation is given. For example Mister Discount Stockbrokers, 768 F.2d at 879 upheld the reimposition *558 of original sanctions after certain findings were reversed, finding such reimposition justified based on the gravity of the remaining violations and the offenders' record. Similar logic has dictated similar ground rules in the frequently-encountered situation when trial judges reimpose criminal sentences after partial reversals by the appellate court (see, e.g., United States v. Bentley, 850 F.2d 327, 328-29 (7th Cir. 1988) (resentencing court may restructure sentence to achieve original intent); United States v. Shue, 825 F.2d 1111, 1113-14 (7th Cir.1987)).[18]
It must be concluded that whatever other reasons CFTC may validly advance for modifying the CBOT-imposed sanctions, that may not be done just because CBOT did not itself reduce the sanctions in the face of fewer violations. That together with the previously-identified defects in CFTC's decision forces another look at the conclusion stated in Malato II at 28-29:
In light of the relative gravity of the violations established on the record, the evidence of mitigating and aggravating circumstances and the guidance concerning CBOT sanctioning policy that may be inferred from the Board's sanction on Morrow for similar conduct (a membership suspension of three years and a fine of $25,000), we conclude that it is appropriate to remit the fine imposed and limit Malato's sanction to the period of suspension served (approximately 4.5 years).

Conclusion
Several of the findings in Malato II are arbitrary, as is CFTC's vacation of the Supplemental Decision's sanctions. Plainly (though regrettably) the matter must be returned to the drawing boards  but the remaining question is to whose. Although Malato II properly expressed a desire to get the matter over and done with, the fact remains that CFTC is itself a board of review and not the original decisionmaker. Accordingly CFTC's opinion in Malato II is vacated, and this action is remanded to CFTC with instructions to remand the matter in turn to CBOT for further action in light of this opinion.[19]
NOTES
[1] For a brief but excellent introduction to futures markets, see Judge Henry Friendly's opinion in Leist v. Simplot, 638 F.2d 283, 286-88 (2d Cir.1980). Leist deals with the way in which such trading works as well as with the regulatory structure created by the Commodity Exchange Act (the "Act"), 7 U.S.C. §§ 1-26. All Act citations in this opinion will simply take the form "Section ," omitting the Title 7 reference.
[2] Because all the episodes occurred in 1983, this opinion will omit the year in further references to the dates of relevant occurrences.
[3] Each Treasury Bond has a par value of $100,000. CBOT treats par as 100 and reports prices accordingly. By conventional practice the figure after the decimal point refers to units of 1/32 each ("points") rather than to the ordinary base-10 meaning. Hence a price of 75.15 corresponds to a bond value of 75 15/32 of $100,000, or $75,468.75 (not $75,150).
[4] CFTC's motion to dismiss is based on the standing argument alone.
[5] CFTC does not argue the more particularized APA § 10(a) standing requirement that the interest asserted by Board must be within the "zone of interests" sought to be protected by the Act (see Clarke v. Securities Industry Ass'n, 479 U.S. 388, 396, 107 S.Ct. 750, 755, 93 L.Ed.2d 757 (1987)).
[6] CFTC filed three memoranda on these motions: one in support of its motions ("CFTC Mem."), one in response to CBOT's motion ("CFTC Ans.Mem.") and the last in reply to CBOT's response to CFTC's motions ("CFTC R.Mem.").
[7] Even that imperfect analogy does not necessarily express a uniform rule  see Houck v. Folding Carton Administration Committee, 881 F.2d 494 (7th Cir.1989), in which Senior District Judge Hubert Will recently filed a Petition for Correction of Opinion, Rehearing and Suggestion for Rehearing In Banc of the Court of Appeals' opinion reversing Judge Will's decision. That petition was denied by the Court of Appeals September 15, 1989, without any indication in the order of denial that Judge Will lacked standing to seek rehearing (Houck v. Folding Carton Administration Committee, 881 F.2d 494 (7th Cir.)). At an earlier stage in the litigation Judge Will and his then colleague Judge Edwin Robson had sought writs of certiorari and mandamus from the Supreme Court  again resolved without any need to address the standing issue (see 881 F.2d at 497).
[8] CBOT wrote CFTC and this Court a September 6, 1989 letter calling attention to two very recent decisions (which had already been read by this Court) that upheld standing on CBOT's part to challenge SEC decisions: Board of Trade v. SEC, 883 F.2d 525 (7th Cir.), and Chicago Mercantile Exchange v. SEC, 883 F.2d 537 (7th Cir. 1989). Both decisions involve CBOT's challenges to SEC decisions involving other exchanges, so they shed no special light here.
[9] Malato II alone, and not CBOT's underlying decision, is the subject of review here (Mister Discount Stockbrokers, Inc. v. SEC, 768 F.2d 875, 877 (7th Cir.1985)).
[10] CBOT also cavils at CFTC's discussion of CBOT's "systematic" findings. But CBOT concedes that CFTC merely rejected one interpretation of that term while affirming CBOT's intended interpretation. Thus that Finding is not at issue.
[11] See 1 Johnson, Commodities Regulation § 1.10, at 34 n. 9 (1982). Leist, 638 F.2d at 286-87 described it:

Futures trading is a zero-sum game. Since money is made from the change in futures contract prices, and every contract has a long and a short, every gain can be matched with a corresponding loss.
[12] CBOT Mem. 9 n. 4 argues that CFTC policy is that unauthorized trade profits belong to the customer, not the broker, citing Shashaani v. Merrill Lynch, Pierce, Fenner & Smith, Inc., [1984-86 Transfer Binder] Comm.Fut.L.Rep. (CCH) ¶ 22,629 at 30,686-87. It seems, though, that the real issue is whether there are unauthorized trade profits. Shashaani was a suit for recovery of profits by a customer. Neither CBOT nor CFTC ever discussed customer restitution as a sanction here.
[13] Decision at 6 cited Regulation 350.04 for that proposition.
[14] This situation (and the one just previously discussed in the text) should be contrasted with the general rule that a decision may be upheld on any ground advanced by an appellee, even if that ground was not relied on by the tribunal below. Here the decision under review is that of CFTC and not CBOT, and it is therefore important to judge CFTC's arbitrariness or lack of it in terms of what was before it, not in terms of afterthoughts first posed to this Court. Agencies whose decisions are subjected to judicial review should not be sandbagged in that way.
[15] Morrow did ultimately "trade ahead" of Malato's customers. But everyone in the pit apparently knew of Malato's orders, so it is difficult to see how that information could have been used or abused.
[16] CBOT discusses Malato's "willfulness" at length in its memoranda, both in regard to "instigation" of Episode 1 and "scienter." This opinion makes clear that although Malato "willfully" instigated Episode 1 in the purely causal sense that he set the chain of events rolling, there is no cause for overturning CFTC's finding that he did not willfully (that is, intentionally or with reckless disregard of the statutory requirements) cheat his customers.
[17] This is not the only evidence of CFTC's arbitrariness in not according proper weight to CBOT's reasonably-supported conclusions. Malato I at 34,708 professed CFTC's deference to CBOT (actually its Floor Governors Committee) in then drawing inferences from evidence presented to it. Despite that earlier lip service to a policy soundly grounded in the Act, CFTC now overturns the reasoned judgment of CBOT without its own reasoned explanation.
[18] Indeed, the criminal sentencing analogy also undercuts another of CFTC's rationales  that co-defendants' punishments must necessarily be equal if their criminal conduct is the same. United States v. Nowicki, 870 F.2d 405, 409 (7th Cir.1989), citing United States v. Neyens, 831 F.2d 156, 159 (7th Cir.1987), states the proper analysis:

If the sentencing judge gives "thoughtful consideration" to the sentence she imposes, this court will not disturb the imposition of disparate sentences on co-defendants.
"Thoughtful consideration" includes all relevant factors, in this case those spelled out in First Commodity.
[19] In at least one respect CFTC ought to do more than a remand without instructions. In its demand for equality of treatment as between Morrow and Malato, CFTC has not adequately explained how a three-year suspension plus $25,000 fine (Morrow's total sanction) equals a 4.5-year suspension plus no fine (the effect of its now-reversed reversal of Malato's sanctions). To avoid the prospect of still another disfavored CBOT decision, CFTC ought to provide better insight to that problem as grist for CBOT's mill. This should not of course be misunderstood as an indication that this Court views an equality of sanctions as between Malato and Morrow as the proper result. One other parenthetical comment is also in order: As previously stated, CFTC had ordered CBOT to remit the fine plus interest from the date of the Decision imposing the fine. If remission is ultimately determined to be appropriate (another issue on which this Court expresses no opinion), interest should of course be paid only from the date Malato actually paid the fine.