**GLENDALE NEIGHBORHOOD ASSOCIATION, an unincorporated association; Randall Gore, Dwight Saffer, and Debra W. Martin, individually, Plaintiffs,**

v.

**GREENSBORO HOUSING AUTHORITY, and Henry J. Cisneros, in his official capacity as Secretary of the United States Department of Housing and Urban Development, Defendants.**

Civil No. 2:95CV00277.

United States District Court,
M.D. North Carolina,
Greensboro Division.

Aug. 30, 1996.

Gary L. Beaver, Patton Boggs, L.L.P., Greensboro, NC, for Plaintiffs.

James R. Turner, Turner Enochs & Lloyd, P.A., and Gill P. Beck, Office of U.S. Attorney, Greensboro, NC, for Defendants.

*MEMORANDUM OPINION*

BULLOCK, Chief Judge.

In February 1995, the Greensboro Housing Authority ("GHA") submitted to the United States Department of Housing and Urban Development ("HUD") a proposal for a new public housing project on Glendale Drive in Greensboro, North Carolina. HUD approved this proposal. An association of people living near the proposed site brought this suit to block the project. Now before the court are Defendants' motion to dismiss the complaint, Plaintiffs' motion to amend the complaint, Defendants' motion for summary judgment, and Plaintiffs' motion for final judgment. For the reasons given below in this memorandum opinion, Defendants' motion to dismiss will be granted in part and denied in part, and Plaintiffs' motion to amend will be denied. On the merits, Defendants' motion for summary judgment will be granted in part and denied in part, and Plaintiffs' motion for final judgment will be granted in part and denied in part. HUD's approval of the site on Glendale Drive will be vacated, and the case will be remanded to HUD.

## FACTS

The Greensboro Housing Authority is a housing authority constituted under North Carolina law. *See* N.C.Gen.Stat. §§ 157–1 to –70 (1983 & Supp.1995). Pursuant to a Notice of Funding Availability published in the Federal Register, GHA submitted a proposal for a new housing project to HUD. The proposal was for a joint public-private housing project on a fourteen-acre site on Glendale Drive, in southern Greensboro, just inside the city limits. (Admin.Record at 121 [henceforth AR].) According to the proposal, GHA would build fifty public housing units on the northern eight acres of the site. GHA would sell the remaining six acres to a non-profit corporation, which would subdivide that parcel into eighteen lots. *Id.* at 122. The corporation would then sell the lots to non-profit sponsors, which would build sin-

gle-family homes and sell them to low-income families. *Id.* HUD agreed to fund the project. 59 Fed.Reg. 66,040, 66,041 (1994).

Concerned that a public housing project would change their neighborhood for the worse, many persons living near the proposed site formed the Glendale Neighborhood Association, an unincorporated association that is one of the plaintiffs in this case. The other plaintiffs are individuals who live near the proposed site. (For convenience, the court will refer to all plaintiffs collectively as "the Association.") Alleging that HUD had improperly approved the site for the proposed project, the Association brought this action to enjoin construction of the project. Specifically, the Association claims that HUD approved a site in an area of minority concentration, in violation of federal statutes and regulations. The Association also claims that HUD violated its own regulations concerning the acceptable density of public housing and the proximity of the site to essential services, such as public transportation and medical facilities.

By order dated June 8, 1995, this court granted the Association's motion for a preliminary injunction against building the project. *Glendale Neighborhood Ass'n v. Greensboro Hous. Auth.*, 901 F.Supp. 996 (M.D.N.C.1995). Now before the court are Defendants' motion to dismiss the complaint, the Association's motion to amend the complaint, Defendants' motion for summary judgment, and the Association's motion for final judgment. The court will address these motions in order.

## DISCUSSION

A. *Defendants' Motion to Dismiss*

■ Defendants seek to dismiss the complaint on two grounds. First, they say that the Association does not have standing to raise its claim. Second, Defendants say that the Association has failed to state a cause of action as to the six acres that are to be sold to private, non-profit developers.[1]

---

1. Although HUD characterizes this question as whether the court has subject matter jurisdiction, HUD's argument is that "Plaintiffs have failed to state a claim entitling them to any relief pertain-

ing to the lower six acres." (Fed.Def.'s Mem. Supp.Mot. to Dismiss at 6.) When the basis for an objection to jurisdiction is that the plaintiff does not have any basis for suit, the objection is

1. Standing

■ Standing refers to a collection of doctrines regarding whether a party is the proper one to bring a suit. *See Valley Forge Christian College v. Americans United for Separation of Church & State, Inc.,* 454 U.S. 464, 484, 102 S.Ct. 752, 765, 70 L.Ed.2d 700 (1982); *Warth v. Seldin,* 422 U.S. 490, 498, 95 S.Ct. 2197, 2204–05, 45 L.Ed.2d 343 (1975). At its core, the constitutional doctrine of standing arises out of the limitation in Article III of the Constitution of the federal judicial power of "Cases" and "Controversies." *E.g., Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560, 112 S.Ct. 2130, 2136, 119 L.Ed.2d 351 (1992). This constitutional doctrine has three parts: the plaintiff must show that he has suffered "injury in fact," that the injury has been caused by some act or omission of the defendant, and that the injury can likely be redressed by action of the court. *Id.* at 560–61, 112 S.Ct. at 2136–37.

■ Because standing is jurisdictional, the burden of establishing it lies on the party seeking to litigate in federal court. *Defenders of Wildlife,* 504 U.S. at 561, 112 S.Ct. at 2136. Moreover, because the elements of standing are "an indispensable part of the plaintiff's case," the burden on the plaintiff at each stage of litigation is the same as for any other substantive element of the claim. *Id.* To survive this motion to dismiss, then, Plaintiffs need plead only "general factual allegations of injury resulting from the defendant's conduct." *Id.*

■ The Association easily satisfies each of the constitutional requirements for standing. It has shown injury in fact by alleging that placement of public housing in their neighborhood, which they allege to be an area of minority concentration, will cause or worsen segregation of that neighborhood. *Gladstone, Realtors v. Village of Bellwood,* 441 U.S. 91, 111, 99 S.Ct. 1601, 1613–14, 60 L.Ed.2d 66 (1979). Plaintiffs have also alleged, with supporting affidavits, that they will suffer injury in the form of diminished property values if the project is built, and this injury also suffices. *Id.* at 115, 99 S.Ct.

at 1615–16. As for the other two elements, the Association has alleged that the cause of these injuries will be HUD's decision to fund the project, and this injury will be redressed if the court enjoins construction of the project.

■ What are more important to this case, however, are the further prudential limits on standing. These are judicially created limits on the jurisdiction of the federal courts. *E.g., United Food and Comm'l Workers Union v. Brown Group, Inc.,* — U.S. —, —, 116 S.Ct. 1529, 1533, 134 L.Ed.2d 758 (1996). In the context of a suit under the Administrative Procedure Act ("APA"), the plaintiff must demonstrate that the injury complained of "falls within the 'zone of interests' sought to be protected by the statutory provision whose violation forms the legal basis for his complaint." *Air Courier Conf. of Am. v. American Postal Workers Union,* 498 U.S. 517, 523–24, 111 S.Ct. 913, 917–18, 112 L.Ed.2d 1125 (1991) (quoting *Lujan v. National Wildlife Federation,* 497 U.S. 871, 883, 110 S.Ct. 3177, 3186, 111 L.Ed.2d 695 (1990)). In keeping with the "presumption in favor of judicial review" under the APA, this test is not very demanding. *Clarke v. Securities Indus. Ass'n,* 479 U.S. 388, 399, 107 S.Ct. 750, 757, 93 L.Ed.2d 757 (1987). This test "denies a right of review if the plaintiff's interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress intended to permit the suit.... [T]here need be no indication of congressional purpose to benefit the would-be plaintiff." *Id.* at 399–400, 107 S.Ct. at 757.

Defendants' motion raises prudential objections to the Association's standing to raise its claims. Broadly characterized, the Association makes three claims. First, GHA approved the project for families with children without considering scattered site housing, contrary to the requirements of HUD's *Public Housing Development Handbook.* 7417.1 REV–1 ¶ 3–75a (1991). (Second Am.Compl. ¶¶ 34, 35.) Second, HUD approved the site even though it was not accessible to "social, recreational, educational, commercial, and

more properly treated as a motion to dismiss for failure to state a claim. *Ridenour v. Andrews*

*Fed. Credit Union,* 897 F.2d 715, 719 (4th Cir. 1990).

health facilities," and was not convenient to public transportation, in violation of HUD's regulations at 24 C.F.R. § 941.202(g) & (h) (1994). (Second Am.Compl. ¶¶ 36–39.) Third, HUD failed to satisfy its affirmative duty to integrate under the Fair Housing Act, 42 U.S.C.A. § 3608(e)(5) (West 1994), and the associated regulations, 24 C.F.R. § 941.202(c) (1994). (Second Am.Compl. ¶¶ 14, 17, 46.) The heart of HUD's objections is that each of the Association's claims flunks the "zone of interests" test.

■ A corollary of the "zone of interests" principle is that a plaintiff has no standing to complain of alleged violations of any statute or regulation intended solely to benefit prospective tenants of the project. *See Alschuler v. Department of Hous. & Urban Dev.*, 686 F.2d 472, 480 (7th Cir.1982). HUD argues that the scattered site requirement is just such a regulation. The court agrees.

■ The *Public Housing Development Handbook* requires local housing authorities to build projects for families, "to the maximum extent practicable," on "scattered sites." ¶ 3–75. Scattered site housing consists of non-contiguous lots, each bearing only a few units. The requirement does not affect the number of units allowed within an area but only their density.

This handbook provision comes in a paragraph that deals with the density of public housing. It appears to implement a regulation providing that "[p]rojects for families with children shall to the maximum extent practicable consist of low-density housing (e.g., non-elevator structures, scattered sites or other types of low-density development appropriate in the community)." 24 C.F.R. § 941.203(e) (1994). This regulation itself is part of a section dealing with design and construction standards for housing projects. The goal of these standards is "to promote the economic and social well being and advancement of the prospective occupants." 24 C.F.R. § 941.203. In *Alschuler*, the Court of Appeals for the Seventh Circuit held that this section's prohibition on high-rise, elevator buildings for families with children was intended solely for the benefit of project residents. 686 F.2d at 480. Because the Association has produced no evidence to the contrary here, the court finds similarly that the scattered-site requirement is a design requirement intended solely to benefit prospective tenants. Therefore, the Association does not have standing to challenge HUD's and GHA's alleged failure to comply with the policy.

■ Although it is a closer question, the court also finds that the Association lacks standing to object to the lack of social, religious, recreational, commercial, and health facilities and the lack of convenient public transportation. As with the scattered site requirement, HUD asserts that its regulations on this point are intended solely for the benefit of prospective tenants. As the sole support for this interpretation, however, HUD seizes on certain language in the complaint and in the *Handbook* as evidence that those provisions are not intended, even in part, to benefit the project's neighbors.

HUD's argument based on the language of the complaint fails. Paragraph thirty-six of the complaint alleges that "HUD requires that proposed sites of public housing project [sic] must be convenient to public transportation or to places of employment which provide a range of jobs for low-income workers and must be accessible to social, religious, recreational, commercial, and health facilities that are adequate to serve the intended occupants of the Project," and paragraph thirty-nine alleges that "[t]he Proposed Site is not accessible to health facilities that are adequate to serve the intended occupants of the Project." HUD asserts that the phrasing of these allegations is an admission by the Association that occupants of the project are the sole intended beneficiaries of HUD's regulations. The simplest objection to this argument is that HUD's interpretation of these allegations is entirely unreasonable. The phrase "adequate to serve the intended occupants of the Project" is only the standard for measuring compliance with HUD's policies.

Notwithstanding its rejection of HUD's argument, the court must agree with HUD's conclusion that the Association lacks standing to claim that the Glendale Drive site is not accessible to social, recreational, educational, commercial, or health facilities, or

that the site is not convenient to public transportation. Certainly, the court considers it likely that the neighbors would suffer from the creation in their midst of a colony of people who are cut off from social services, recreational facilities, schools, and medical services, and who have no jobs because they cannot afford to get to them. The question now, however, is not whether the Association has alleged injury in fact, but whether the injury alleged is within the zone of interests that this requirement intended to protect. *Air Courier Conf.,* 498 U.S. at 524, 111 S.Ct. at 918.

On their face, these requirements for the site appear to promote the same ends as the requirements for project design. That is, they are intended to protect the welfare of the future occupants of the project, and to promote opportunities for them. This conclusion is strengthened by the text of the regulation: "The housing must be accessible to social, recreational, commercial, and health facilities and services, and other municipal facilities and services that are at least equivalent to those typically found in neighborhoods consisting largely of similar unassisted standard housing." 24 C.F.R. § 941.202(g). The implication of measuring the adequacy of facilities by comparison with typical residential neighborhoods is that the goal of the regulation is to make sure housing projects are placed in residential areas, not isolated, remote places or industrial zones. The further implication is that the future occupants of the project are the intended beneficiaries, and the neighbors of the site are not.

Finally, HUD renews its objections to the Association's standing to challenge HUD's failure to comply with its own regulations regarding its affirmative duty to prevent segregation. HUD does not make any new arguments on this point, but simply incorporates its argument from its brief of May 17, 1995, opposing the preliminary injunction that this court subsequently granted. The regulations under which the Association's claim arises implement HUD's obligations under the Fair Housing Act, 42 U.S.C.A. §§ 3601–3631. The Supreme Court has held more than once that neighbors aggrieved by segregation in their neighborhoods have standing to sue under the Fair Housing Act. *Gladstone,* 441 U.S. at 115, 99 S.Ct. at 1615–16 (Section 812 of the Act, 42 U.S.C.A. § 3612 (West 1994)); *Trafficante v. Metropolitan Life Ins. Co.,* 409 U.S. 205, 212, 93 S.Ct. 364, 368, 34 L.Ed.2d 415 (1972) (Section 810 of the Act, 42 U.S.C.A. § 3610 (West 1994)). The court sees no different prudential considerations that would take the Plaintiffs out of the zone of interests protected by the section of the Fair Housing Act on which they rely. Therefore, the Association has standing to object to HUD's alleged failure to fulfill its affirmative duty to avoid segregation.

2. Motion to dismiss for failure to state a cause of action

Defendants have also moved to dismiss the complaint for failure to state a cause of action as to the southern six acres of the proposed site, which, under the original proposal, were to be subdivided and sold to independent, non-profit developers who would build single-family homes on the lots.

Motions to dismiss for failure to state a claim are not favored. "In general, a motion to dismiss for failure to state a claim should not be granted unless it appears certain that the plaintiff can prove no set of facts which would support its claim and would entitle it to relief." *Mylan Labs., Inc. v. Matkari,* 7 F.3d 1130, 1134 (4th Cir.1993), *cert. denied,* 510 U.S. 1197, 114 S.Ct. 1307, 127 L.Ed.2d 658 (1994). Nonetheless, that standard is satisfied in this case.

The Association has not sought any relief with regard to the southern six acres, other than to ask the court to forbid HUD to develop them as part of a joint public-private housing project. The Association has given no other ground for relief, and the court has not found any basis for any claim related to this second parcel. Indeed, the Association admits that "even if the defendants are permanently enjoined from themselves developing the site on the basis of their decisions presently under review in this case, they may sell any part of the fourteen acres to whomever they want for development." (Pls.' Resp. to Fed.Defs.' Mot. to Dismiss at 8.)

Selling this parcel is what GHA was going to do all along. If that is the case, however, the court sees no reason to make GHA wait until the other matters are resolved. Accordingly, the court will grant Defendants' motion to dismiss the complaint as to the southern six acres, which GHA intended to sell to non-profit developers.

The Association objects to this dismissal on the ground of judicial estoppel, but this doctrine does not apply here. Judicial estoppel prevents a party from taking inconsistent positions in the same or related litigation. *United Virginia Bank v. B.F. Saul Real Estate Inv. Trust,* 641 F.2d 185, 190 (4th Cir.1981). The doctrine prevents parties from "playing fast and loose" with the judicial process. *Id.* (quotation omitted).

The asserted basis for the invocation of judicial estoppel is that the court let GHA buy the fourteen-acre proposed site following GHA's representation that neither GHA nor HUD would seek to use the purchase to improve its position. If, as the Association admits, GHA can sell the southern six acres to anyone it wants, GHA has in no way improved its position. Neither GHA's nor HUD's position is inconsistent with anything either agency has done previously, and there is no abuse of the judicial process here. Accordingly, no judicial estoppel applies.

**B.** *The Association's Motion to Amend the Complaint*

In response to Defendants' motion to dismiss, the Association has moved to amend the second amended complaint to add a citation to the United States Housing Act, 42 U.S.C.A. §§ 1437–1437x. This motion was in response to HUD's argument that the Association lacked standing to raise one of its claims because the Association had not identified the statute under which it claimed to be injured. Rule 15(a) of the Federal Rules of Civil Procedure says that leave to amend "shall be freely given when justice so requires." Accordingly, leave to amend should be denied only on the grounds of prejudice to the other party, futility, or bad faith. *Island Creek Coal Co. v. Lake Shore, Inc.,* 832 F.2d 274, 279 (4th Cir.1987). Because the court has already found on other grounds that the

Association lacks standing to claim that HUD failed to follow its own site selection standards, this amendment would be futile. Accordingly, the Association's motion to amend will be denied.

**C.** *Merits*

**1. Standard of review**

This action has been brought pursuant to the judicial review provisions of the Administrative Procedure Act, 5 U.S.C.A. §§ 701–706 (West 1996). Specifically, the Association asks the court to set aside HUD's approval of GHA's proposed housing project as "arbitrary, capricious, an abuse of discretion, [and] otherwise not in accordance with the law." Section 706(2)(A). The scope of review that this section establishes is narrow: the court may not substitute its judgment for that of the agency. *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Ins. Co.,* 463 U.S. 29, 43, 103 S.Ct. 2856, 2866–67, 77 L.Ed.2d 443 (1983); *Citizens to Preserve Overton Park, Inc., v. Volpe,* 401 U.S. 402, 416, 91 S.Ct. 814, 823–24, 28 L.Ed.2d 136 (1971). "[T]he court must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Overton Park,* 401 U.S. at 416, 91 S.Ct. at 824.

The deference this court must give to the agency's judgment, however, does not foreclose a "searching and careful" examination of the record. *Id.* For agency action to survive review, "the agency must examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *State Farm,* 463 U.S. at 42, 103 S.Ct. at 2866 (quoting *Burlington Truck Lines, Inc. v. United States,* 371 U.S. 156, 168, 83 S.Ct. 239, 246, 9 L.Ed.2d 207 (1962)). If the court upholds the agency's action, the court must do so only on the basis articulated by the agency in the record. *State Farm,* 463 U.S. at 50, 103 S.Ct. at 2870. It is well settled that the court may not consider the agency's post hoc rationalizations for its action, *id.,* nor may the court itself supply a reason that the agency failed to give, *Bowman Transp., Inc. v. Arkansas–Best Freight*

*Sys., Inc.,* 419 U.S. 281, 285–86, 95 S.Ct. 438, 441–42, 42 L.Ed.2d 447 (1974).

## 2. Claims against HUD

### a. *HUD improperly determined that the proposed site is in a racially mixed area*

Under the Fair Housing Act, the Secretary of HUD must administer housing programs affirmatively to promote racial integration. 42 U.S.C.A. § 3608(e)(5) (West 1994). HUD's regulations implementing this statutory duty appear at 24 C.F.R. § 941.202(c) (1994). They provide:

(c) The site for new construction projects must not be located in: (1) An area of minority concentration unless (i) sufficient, comparable opportunities exist for housing for minority families, in the income range to be served by the proposed project, outside areas of minority concentration ...; or (2) A racially mixed area if the project will cause a significant increase in the proportion of minority to non-minority residents in the area.

The Association claims that HUD improperly found that these regulatory criteria were satisfied.

Ophelia Dargan of HUD's Fair Housing and Equal Opportunity Division ("FHEO") analyzed the proposal under the regulatory criteria and, by memorandum dated March 30, 1995, (AR 1 to 4), indicated that the project met these standards. Dargan relied solely on census data for her analysis. The site is in Census Tract 126.12 and abuts Census Tract 167, *see* AR at 3, and Dargan defined the area of the site as the combination of the two tracts, *id.* Based on the 1990 census, she found that this area was 79.1% non-minority and 20% minority. *Id.* She thus found that "[t]he proposed site is in a racially mixed area," and that building the project would not " 'cause a significant increase in the proportion of minority to non-minority residents in the area.' " *Id.* (quoting 24 C.F.R. § 941.202(c)(2)).

Although she found that the proposed site was not in an area of minority concentration, (AR at 3), Dargan also considered whether Greensboro provided "sufficient, comparable opportunities ... outside areas of minority concentration," 24 C.F.R. § 941.202(c)(1)(i). She noted that GHA "has approximately 2,008 family units of which 487 are outside areas of minority concentration," (AR at 1), but found that this constituted sufficient and comparable opportunities under the regulation, (AR at 2).

The Association challenges both parts of FHEO's findings. First, the Association says that FHEO's designation of the combined census tracts as the area of the site was arbitrary and capricious, making FHEO's determination that the area of the site was racially mixed also arbitrary and capricious. Second, the Association objects to the finding that sufficient, comparable opportunities for housing exist outside areas of minority concentration when three-fourths of the unites in Greensboro are in areas of minority concentration.

The Association's first challenge goes to the heart of FHEO's determination. Logically, the FHEO cannot identify the characteristics of the area of the site without first defining that site. If that definition is improper, the characterization of that area is meaningless.

The main ground for the Association's objection to FHEO's definition of the area of the site is Notice H–81–2 from HUD, on the subject of "clarification of site and neighborhood standards for new assisted housing projects in areas of minority concentration." This notice expired on July 31, 1981, but HUD's offices have been instructed to use it for guidance.[2] The part of the notice that is most relevant here reads:

This criterion is not intended to be applied mechanically or with mathematical precision; reasonable judgment should be exercised. Determinations as to whether or not a site is located in an area of minority

---

**2.** The source of this instruction does not appear in the administrative record. However, both parties assert that FHEO has been instructed to take guidance from this notice. Moreover, much of Dargan's memorandum is quotation or para-

phrasing of portions of this notice, and the entire notice itself appears in the administrative record. (AR 105–12.) Thus, the court will consider this notice as evidence of HUD's policies.

concentration need not rely solely on census tract date if those data are clearly out of date and do not accurately reflect the neighborhood racial composition.

(AR at 106.) The Association relies also on *King v. Harris,* where a district court held that "reliance on census tract boundaries *in vacuo* in order to delineate a relevant area of minority or low-income concentration [is] arbitrary and capricious and in violation of HUD's statutory duty to integrate." 464 F.Supp. 827, 839 (E.D.N.Y.), *aff'd sub nom. King v. Faymor Dev. Co.,* 614 F.2d 1288 (2d Cir.1979), *vacated on different grounds,* 446 U.S. 905, 100 S.Ct. 1828, 64 L.Ed.2d 256 (1980).

▪ An agency must follow its own rules. *Chen Zhou Chai v. Carroll,* 48 F.3d 1331, 1340 (4th Cir.1995); *Electronic Components Corp. v. NLRB,* 546 F.2d 1088, 1090 (4th Cir.1976). Moreover, "[i]t is a well-settled proposition of administrative law that when an agency deviates from established precedent, it must provide a reasoned explanation for its failure to follow its own precedents." *Baltimore Gas & Elec. Co. v. Heintz,* 760 F.2d 1408, 1418 (4th Cir.) (dictum), *cert. denied,* 474 U.S. 847, 106 S.Ct. 141, 88 L.Ed.2d 116 (1985); *accord Atchison, T. & S.F. Ry. Co. v. Wichita Bd. of Trade,* 412 U.S. 800, 808, 93 S.Ct. 2367, 2375, 37 L.Ed.2d 350 (1973) (plurality opinion); *Roadway Express, Inc. v. NLRB,* 647 F.2d 415, 419 (4th Cir. 1981); *Contractors Transp. Corp. v. United States,* 537 F.2d 1160, 1162 (4th Cir.1976). This is not to say that prior policies are absolutely binding on the agency. To the contrary, an agency is free to depart from those norms at any time, either in an individual case or as a consequence of adoption of new norms, but the agency must explain the grounds for the departure sufficiently "that the reviewing court may understand the basis of the agency's action and so may judge the consistency of that action with the agency's mandate." *Atchison, T. & S.F.,* 412 U.S. at 808, 93 S.Ct. at 2375.[3]

▪ The FHEO memorandum approving the area of the site says that "[f]or assisted housing sites located on census tract boundaries, the site area means the census tract in which the assisted housing is located and the census tract(s) adjacent to the boundary on which the assisted housing development is located." (AR at 3.) This language was taken from 24 C.F.R. § 770.103, which had to do with defining the area of the site for the sole purpose of evaluating concentrations of assisted housing, and which had been withdrawn from the Code of Federal Regulations before FHEO's evaluation. Contrary to the Association's argument, however, FHEO's use of language from a withdrawn regulation that applied only in another context is not necessarily improper.

Nonetheless, HUD's designation of the area of the site fails because HUD gave no reason why this definition is proper. To define the site mechanically as the union of two census tracts, then to derive its characteristics by combining population figures, is to act directly in contradiction to Notice H–81–2. Far from explaining this departure from prior policies, FHEO gave no reason at all why it considered these two tracts to be the appropriate area of the site.

Moreover, absent a showing by HUD that it had no reasonable alternative to use of only census tract boundaries, the procedure HUD used is arbitrary and capricious because it ignores important facts. As the court explained in *King,*

> In general a neighborhood represents any section of a region or city, having indefinite boundaries, and which is drawn together by the shared perceptions of its residents as to what constitutes their neighborhood, by the facilities generally available for their use, by their social and economic status, and by natural or manmade physical boundaries.

3. HUD argues that it "is not bound to follow every provision in the notice." (Fed.Defs.' Mem. Supp.Mot. for Summ.J. at 10.) In so arguing, HUD argues against a position that the Association has never advocated and which this court has explicitly rejected. *See* Order of Aug. 21, 1995, at 9–11. To make the correct principle clear: HUD is free to depart from any provision in Notice H–81–2 at any time, so long as it explains in the administrative record why it is departing. Of course, in explaining its decision, the agency must articulate a rational connection between the facts and its decision. *Burlington Truck Lines,* 371 U.S. at 168, 83 S.Ct. at 245–46.

... [I]maginary census tract boundaries *alone* reflect neither a community's perception of itself nor the social cohesiveness of a given area. While census tracts may provide HUD with a general indication of residential patterns, they are inadequate as the sole indicators of the racial or economic composition of housing in a neighborhood.

464 F.Supp. at 839.

This principle applies with special force here, where the tracts are so different. Census Tract 126.12 is entirely within the City of Greensboro, and has a minority concentration of 38.8% according to the 1990 census. (AR at 3.) Census Tract 167, in contrast, is entirely to the south of Greensboro, and has a minority concentration of only 6.5%. *Id.* Further, because the record does not contain a map showing the full extent of Census Tract 167, the court cannot say whether and to what extent geography favors joining the two tracts.[4] Indeed, according to information that the Association gave to HUD, geography disfavors this definition, because a highway bypass is planned across Census Tract 167, about 1,000 yards south of Glendale Drive. (AR at 15.) HUD gave no indication of having considered this information. HUD's designation of the area of the site was therefore arbitrary and capricious.

■ Because the court rejects HUD's definition, the court holds that HUD's finding that the area of the site was racially mixed was also arbitrary and capricious. So far as the court can determine, nothing in any statute, regulation, or policy, or the administrative record, defines "area of minority concentration" or "racially mixed area." The lack of a statutory or regulatory definition leaves substantial room for HUD to interpret these terms. Whatever meaning HUD gave these terms, however, would have to be presented and justified in the administrative record.

Because HUD did not explain its use of these terms at all, the court would not likely have been able to sustain *any* characterization of the area of the site, no matter how HUD defined the area.

■ HUD's finding is further infirm because HUD did not consider evidence of a trend of increasing minority concentration in the area of the site, even though Notice H–81–2 expressly directs FHEO to consider such evidence. The administrative record contains a detailed census of Block Group 5 of Census Tract 126.12 done by the Association. (AR at 32–68.) According to the Association, the minority percentage in this block group increased from 50.7% in 1990 to 59.4% in 1995. (AR at 15.) The Association's survey indicates, moreover, that the area immediately south of the proposed site across Glendale Drive is predominantly minority, (AR at 16), contradicting GHA's assertion in the proposal that "the area across Glendale to the south of the site has been rapidly developing with new sales housing predominantly occupied by white families," (AR at 125). The record does not indicate any consideration of this proffered information. Of course, HUD does not have to accept this survey uncritically; it is offered by a group that seeks to block HUD's plans. What HUD cannot do, however, is pretend this information is not in the administrative record. By doing so, HUD has "entirely failed to consider an important aspect of the problem," which makes its decision arbitrary and capricious. *State Farm*, 463 U.S. at 43, 103 S.Ct. at 2866–67.

b. *HUD improperly determined that sufficient, comparable opportunities existed outside areas of minority concentration*

■ In its briefs, HUD appears to concede that the designation of the area as

---

**4.** HUD has admitted in ¶ 23 of its Answer that the area of Census Tract 126.12 is approximately 1.7 square miles and the area of Census Tract 167 is approximately 26.7 square miles. Because these facts are not in the administrative record, the court does not base its decision on them. Nonetheless, if they were in the record, they would provide an independent ground for the court's decision, in that the court would find it arbitrary and capricious to determine the char-

acteristics of the site of a housing project in Greensboro by considering the whole of a rural tract that is itself one-fourth the size of the city of Greensboro. The dissimilarity between the two tracts is even more pronounced when one considers that even though Census Tract 167 is more than fifteen times larger than Census Tract 126.12, the population of Census Tract 167 is only 1.25 times the population of Census Tract 126.12.

"racially mixed" cannot stand. For example, HUD says: "This case is unique in that ... FHEO determined that the area should be approved for construction *only* if the safeguards in the regulations were met." (*See* Fed.Defs' Mem.Supp.Mot.Summ.J. at 11 (emphasis added)). Further: "[T]here is no question but that the proposed project will be built in an area with a high percentage of minorities.... When, as in this case, there is a high minority population...." *Id.* at 16. Nevertheless, HUD argues that any error in defining the area of the site was harmless because FHEO found also that the project satisfied an exception to the rule against building projects in areas of minority concentration. HUD may approve a site in an area of minority concentration if "sufficient, comparable opportunities exist for housing for minority families, in the income range to be served by the proposed project, outside areas of minority concentration." 24 C.F.R. § 941.202(c)(1)(i). Because FHEO found these criteria to be satisfied, (AR at 2), HUD argues, FHEO would have approved the site anyway. Thus, HUD says, the court should let HUD's decision stand. *See., e.g., Eastern Carolinas Broadcasting Co. v. FCC,* 762 F.2d 95, 104 (D.C.Cir.1985); 5 U.S.C.A. § 706 (West 1996).

FHEO found that opportunities for housing for minority families outside the areas of minority concentration were sufficient and comparable to this opportunity. The record does not support either part of this finding. The FHEO memorandum consists largely of recitations of legal standards and factual data, but it is silent as to how the law applies to those facts. Instead of explaining FHEO's conclusions, the recitations are followed only by conclusory statements that the standards are satisfied. The law requires the agency to "articulate [a] rational connection between the facts found and the choice made." *Burlington Truck Lines,* 371 U.S. at 168, 83 S.Ct. at 245. Far from meeting this requirement, however, the memorandum contains scant articulation of any connection between the facts found and the choices made.

Neither "sufficient" not "comparable" is defined in the regulations. Notice H–81–2 elaborates upon both terms, however, and the notice's discussion of these terms appears nearly verbatim in the FHEO memorandum. The memorandum reads:

'Sufficient' does not require that in every locality there be an equal number of assisted units within and outside of areas of minority concentration. Rather, application of this standard should produce a reasonable distribution of assisted units each year, which, over a period of several years, will approach an appropriate balance of housing choices available for lower income minority families and in relation to the racial mix of the locality's population.

Units may be considered 'comparable opportunities' if they have the same household type (elderly, handicapped, family, large family) and tenure type (owner/renter); require approximately the same tenant contribution towards rent; serve the same income group; are located in the same housing market; and are in standard condition.

(AR at 2.)

This notice gives the decision maker substantial discretion in deciding whether the number of units outside an area of minority concentration is sufficient. In essence, the decision maker must find that the number of units now in existence and currently planned is consistent with achieving the goals of the Fair Housing Act. The agency still must cogently explain its exercise of discretion. *State Farm,* 463 U.S. at 48–49, 103 S.Ct. at 2869–70.

In finding that Greensboro has sufficient housing outside areas of minority concentration, FHEO observes that GHA "has approximately 2,008 family units of which 487 are outside areas of minority concentration," (AR at 1.) This fact suggests that the number of units outside areas of minority concentration is not sufficient. The memorandum adds, however, that "since 1977 ... all construction has been outside areas of minority concentration." (AR at 4.) It is reasonably clear to the court that FHEO, considering GHA's recent course of building, found that putting this project in an area of minority concentration would still be consistent with achieving integration. Although the court "may not supply a reasoned basis for the

agency's action that the agency itself has not given, [it] will uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned." *Bowman Transp., Inc. v. Arkansas–Best Freight Sys., Inc.*, 419 U.S. 281, 285–86, 95 S.Ct. 438, 442, 42 L.Ed.2d 447 (1974) (citation omitted).

To find that this was HUD's reason comes uncomfortably close to supplying a reason for the agency. Even so, this would not save HUD's decision because FHEO did not suggest how it was measuring sufficiency. The notice, quoted in the FHEO memorandum, requires housing plans to "approach an appropriate balance" of opportunities inside and outside of areas of minority concentration. FHEO, however, failed to consider any of the standards in Notice H–81–2 for identifying what balance would be appropriate.

The notice specifies that "[a]n appropriate balance in any locality should be determined in light of local conditions affecting the range of housing choices available for low-income minority persons and in relation to the racial mix of the locality's population." (AR at 107.) The basis for assessing local conditions is set forth later in the notice, where it lists eight factors relevant to the evaluation of local conditions. (AR at 110–11.) The FHEO memorandum, however, lists only three of the factors and contains nearly no discussion of them.

The court can discern some connection between the facts discussed in the FHEO memorandum and some of the factors listed. One factor is the existence of "[a] significant number of assisted housing units are available outside areas of minority concentration." (AR at 3.) The decision maker could consider the 487 units of family housing outside areas of minority concentration to be significant. Another factor is whether "[t]here is significant integration of assisted housing projects constructed or rehabilitated in the past ten years, relative to the racial mix of the eligible population." *Id.* Page Four of the FHEO memorandum notes that all of GHA's sites "have a racial mix." [5] (AR at 4.) FHEO is not required to expound on these factors, but where the agency has this much

discretion, and where, by its own guidelines, HUD believes analysis of several factors is appropriate, the agency should provide at least some reasoned discussion of which factors it considers appropriate and why, and how those factors apply to the case before it. Reasoned analysis, however, is precisely what is lacking from the FHEO memorandum.

FHEO's analysis of the "comparable" part of "sufficient, comparable opportunities" is even more defective. The FHEO memorandum recites the standard from Notice H–81–2, which recommends that the decision maker consider the household type, whether the tenant owns or rents, the tenant contribution toward rent, the income group the project serves, the housing market, and the condition of the buildings. (AR at 2.) The closest the FHEO memorandum comes to discussing any of these factors is when the memorandum says that GHA "has approximately 2,008 family units of which 487 are outside areas of minority concentration." (AR at 1.) The other factors are simply not mentioned. The implication is that HUD considers every unit of public housing to be exactly the same as every other unit of public housing.

HUD makes exactly this argument in one of its briefs. (Fed.Defs.' Mem.Supp.Mot. Summ.J. at 13–14.) The first problem with this argument, however, is that it belongs in the administrative record, not in HUD's brief. Moreover, this reason does not make sense, considering the directive in Notice H–81–2 to consider several factors. If, by regulation, these factors would be exactly the same for each unit of family housing, there would have been no point in putting in the notice a directive to consider these factors, nor would there have been any point in reciting these factors in the FHEO memorandum. Because there is no support in the record for FHEO's finding that comparable opportunities for housing existed outside areas of minority concentration, this finding was arbitrary and capricious.

In sum, FHEO was arbitrary and capricious in defining the area of the site. Thus,

---

**5.** Although this may be literally true, the court notes that HUD's own document shows that as of

February 1, 1995, five of GHA's eighteen communities were at least 95% black. (AR at 5.)

the designation of that area as racially mixed cannot stand. HUD's fall back position, that it can build the Glendale Drive project even if the area of the site is an area of minority concentration because there are sufficient, comparable opportunities for housing for minorities outside areas of minority concentration, is also not supported by the record. Thus, the court will vacate HUD's approval of the Glendale Drive project and remand this case to the agency for further consideration.

### 3. Claims against the Greensboro Housing Authority

■■ Because it is not an agency of the federal government, GHA is not subject to the Administrative Procedure Act. *See* 5 U.S.C.A. § 701(b)(1) (West 1996). However, under the law of North Carolina, GHA's choice of a site can be overturned if it amounts to "arbitrary and capricious conduct amounting to an abuse of discretion." *Singleton v. Stewart,* 280 N.C. 460, 466, 186 S.E.2d 400, 404 (1972). The court must recognize, however, that GHA has "wide discretionary power in the selection of a site for a low-rent building project, and the exercise of this discretionary power may not ordinarily become an issuable question." *Id.*

■■ The Association argues, correctly, that GHA is bound by the Fair Housing Act. *Smith v. Town of Clarkton,* 682 F.2d 1055, 1068 (4th Cir.1982). The Fair Housing Act, however, imposes affirmative duties only upon *federal* officials and agencies. 42 U.S.C.A. § 3609(d), (e)(5) (West 1994). The Fair Housing Act imposes on local authorities the duty to refrain from discrimination, *Town of Clarkton,* 682 F.2d at 1068, and, as HUD points out at great length and with much vigor,[6] the Association does not allege that anyone has acted discriminatorily, and there is no evidence indicating any discrimination has occurred. Thus, the facts do not support a finding by the court that GHA has violated the Fair Housing Act. Accordingly,

GHA is entitled to judgment in its favor, and the court will dismiss the claim against it.

### CONCLUSION

Because the record is inadequate to support HUD's approval of the Glendale Drive housing project, the court will vacate HUD's approval and remand the case to HUD for further proceedings consistent with this opinion. HUD may well be able to justify its decision to approve this project. Nonetheless, the question for the court is not whether the agency could justify its decision, but whether the agency *has* adequately explained its decision on the administrative record. As the Supreme Court has said, "Expert discretion is the lifeblood of the administrative process, but 'unless we make the requirements for administrative action strict and demanding, *expertise,* the strength of modern government, can become a monster which rules with no practical limits on its discretion.'" *Burlington Truck Lines,* 371 U.S. at 167, 83 S.Ct. at 245 (quoting *New York v. United States,* 342 U.S. 882, 884, 72 S.Ct. 152, 153, 96 L.Ed. 662 (1951) (Black, J., dissenting)).

An order and judgment in accordance with this memorandum opinion shall be entered contemporaneously herewith.

### *ORDER and JUDGMENT*

For the reasons stated in the memorandum opinion filed contemporaneously herewith,

IT IS **ORDERED** that Defendant's motion to dismiss [53–1] on the grounds that Plaintiffs have no standing to assert the claims is **DENIED.**

IT IS **FURTHER ORDERED** that Defendants' motion to dismiss Plaintiffs' claims for failure to state a cause of action [53–2] as to the southern six acres of the proposed Glendale Drive site is **GRANTED** and all claims as to this parcel are **DISMISSED** with prejudice.

---

**6.** Considering that the allegation against HUD is not that HUD's approval of the Glendale Drive project was motivated by racial animus, but that it was inconsistent with HUD's affirmative duty to integrate, the court can only wonder why HUD used so much energy to establish an irrelevant fact.

IT IS **FURTHER ORDERED AND AD-JUDGED** that the Greensboro Housing Authority's motion for summary judgment [51] is **GRANTED** as to the claims against the Greensboro Housing Authority, and Plaintiffs' claims against the Greensboro Housing Authority are **DISMISSED** with prejudice.

IT IS **FURTHER ORDERED** that Plaintiffs' motion to amend the complaint [62] is **DENIED.**

IT IS **FURTHER ORDERED AND AD-JUDGED** that the United States Department of Housing and Urban Development's approval of a fifty-unit housing project on the northern eight acres of the proposed Glendale Drive site is **VACATED,** and this case is **REMANDED** to the United States Department of Housing and Urban Development for further proceedings consistent with the memorandum opinion, order and judgment.